Present:  All the Justices

CLEVELAND HUGHES, ET AL.

v.  Record No. 950520

WALTER COLE, ET AL.

                                        OPINION               BY
                              CHIEF JUSTICE HARRY L. CARRICO
                                      January 12, 1996
WALTER COLE, ET AL.

v.  Record No. 950513

RUSSELL E. TWIFORD, ET AL.


                                        FROM THE CIRCUIT COURT OF
THE CITY OF CHESAPEAKE
                            E. Preston Grissom, Judge


     The issue presented in Hughes v. Cole, Record No. 950520, involves the validity of an agreement among several residents of North Carolina to share the proceeds of winning tickets in the Virginia lottery, the present controversy involving a ticket worth approximately $9 million.  The question presented in Cole v. Twiford, Record No. 950513, involves the correctness of the trial court's award of attorneys' fees to counsel who at one time or another represented the prevailing parties below.

## Hughes v. Cole

     The record shows that in late 1989, Cleveland Hughes, Walter Cole, and others entered into an oral agreement in Elizabeth City, North Carolina, to form "a venture or association" to purchase tickets in the Lotto lottery conducted by the State Lottery Department of the Commonwealth of Virginia (the Lottery Department or the Department).  The agreement provided that the members would "share equally the profits of the venture."

The members pooled their funds to carry out the purposes of the venture and placed the funds in a strongbox located in a building in Elizabeth City, where the members regularly met. Each week, the members selected the numbers to be played from a list of 40 combinations the members had identified as prospective choices approximately one year prior to the events that are presently in dispute. The combination 03-07-08-15-27-42 was among the 40 combinations previously identified, and it was played, along with other specific combinations, in subsequent biweekly lottery games.

It was the practice that one member of the venture would journey to a 7-Eleven store in Chesapeake, Virginia, to purchase the tickets containing the numbers selected for a particular week. The tickets were returned to Elizabeth City and placed in the same strongbox in which the pooled funds were kept.

In the summer of 1992, Walter Cole assumed the responsibility of purchasing lottery tickets on behalf of the venture. The particular drawing that is in issue here took place on September 12, 1992. At the time, the membership of the venture consisted of Walter Cole, Cleveland Hughes, Richard Johnson, James L. Weeks, William L. Sharpe, Jr., and Hercules "Trink" Cole, Walter's brother.

In the week before the drawing in issue, each member of the venture paid his share of the cost of purchasing lottery tickets for the week ending September 12. On September 9, Walter Cole took the funds from the strongbox, journeyed to the 7-Eleven store in Chesapeake and purchased, with the funds of the venture, tickets containing several, but not all, of the previously

selected combinations of numbers, including the combination 03-07-08-15-27-42. This number was drawn on September 12 as the winning number, with an estimated prize of $18 million.[1] Another individual not involved in this dispute played the same number; therefore, the amount in dispute here is approximately $9 million.

On September 13, Walter Cole advised Cleveland Hughes that he had possession of the winning ticket and that he would not share the proceeds with the other members of the venture. On September 16, Walter Cole presented and delivered the winning ticket to the Lottery Department in Richmond. At that time, on a form supplied by the Department, Cole executed in favor of his children, Hercules Cole, Leondas Cole, Alfreda Lee, and Virginia Bembury, an "Agreement to Share Ownership and Proceeds of Lottery Ticket." They claimed sole ownership of the ticket and its proceeds.

Also on September 16, prior to Walter Cole's presentation and

---

[1]Walter Cole asserted in a responsive pleading filed in the trial court, and continues to assert in the appellees' brief filed in this Court, that he purchased the winning lottery ticket for himself, with his own money, more than one-half hour after he purchased six tickets for the members of the venture, that he made the second purchase with the knowledge and consent of the other members of the venture, that they declined to play the winning number, that they provided no funds for its purchase, and that he kept the tickets acquired in the two purchases in separate envelopes. However, in a letter opinion announcing the award of summary judgment in Walter Cole's favor, see infra, the trial judge ruled that he would consider as true only those facts alleged in the bill of complaint that commenced this litigation against Walter Cole. Although the facts alleged in the bill of complaint are directly contrary to Walter Cole's version of his purchase of the winning ticket on September 9, 1992, no cross-error has been assigned to the trial court's ruling. Rule 5:18. Accordingly, the facts stated in the text concerning Walter Cole's purchase of the winning ticket have been taken from the allegations of the bill of complaint.

delivery of the winning ticket to the Lottery Department, Cleveland Hughes, Richard Johnson, James L. Weeks, and William L. Sharpe, Jr. (the Hughes Group or the Group), had notified the Department that a dispute regarding the ownership of the ticket had arisen between Walter Cole and the Hughes Group and that a hearing on a request for temporary injunctive relief had been scheduled for the next day. The Department refused to disburse the proceeds of the ticket presented by Walter Cole pending the outcome of the injunction hearing.

On September 17, 1992, the Hughes Group filed a bill of complaint in the trial court against Walter Cole and his four children (the Coles) as well as the Lottery Department. The bill prayed for a declaration that a partnership or joint venture existed among Walter Cole, Hercules "Trink" Cole, and the Hughes Group and that the winning lottery ticket and its proceeds were the property of the venture. The bill also prayed for an order temporarily restraining the Department from paying the proceeds of the winning ticket until further order of the court. On the same date that the bill was filed, the trial court granted the request for a temporary injunction.[2] Thereafter, the Coles filed an answer in which they denied all the essential allegations of the bill of complaint.

_____

[2]By order entered January 12, 1994, the trial court dissolved the temporary injunction "with respect to the [portion] of the lottery prize as to which the ownership of WALTER COLE is uncontested by [the Hughes Group]" and ordered the Lottery Department to pay the Coles "the two annual installments on the aforesaid [portion] of the lottery prize which were otherwise due and payable in September, 1992 and August, 1993."

On September 30, 1992, the Coles filed a bill of complaint against the Hughes Group and Hercules "Trink" Cole in the Superior Court of Pasquotank County, North Carolina, praying for a declaration that the Coles were "the sole and individual owners of the winning ticket." The Hughes Group filed an answer and also filed a counterclaim in which it moved for a declaration that the winning lottery ticket and its proceeds belonged to the venture.

By an order entered December 10, 1992, the Superior Court awarded the Coles judgment on the pleadings and declared that they were the sole owners of the winning ticket and its proceeds. In a second order entered the same date, the court dismissed the counterclaim filed by the Hughes Group on the ground that the venture was "illegal and against the public policy of [North Carolina]."

On April 19, 1994, the North Carolina Court of Appeals vacated the first order, concluding that because the winning lottery ticket was located in Virginia, the Superior Court lacked in rem jurisdiction to adjudicate title to the ticket. Cole v. Hughes, 442 S.E.2d 86, 89 (N.C. App. 1994). However, the Court of Appeals held that the Superior Court did have jurisdiction to adjudicate the rights of the parties under the alleged joint venture agreement since all the parties to the agreement resided in North Carolina and had entered into the agreement there. Id.

The Court of Appeals then proceeded to affirm the Superior Court's second order, holding it was "indisputable that the agreement is void as against North Carolina public policy" and is "unenforceable in North Carolina." Id. at 90. The court stated

that its disposition of the case "leaves resolution of the issue of ownership of the lottery ticket and entitlement to its proceeds to the Virginia authorities."  Id.

In the meantime, the trial court had stayed proceedings in the Virginia case pending the outcome of the North Carolina litigation.  On May 4, 1994, after the North Carolina Court of Appeals handed down its opinion, the Coles filed in the trial court a motion for summary judgment and for dissolution of the temporary injunction that had been in effect since September 17, 1992.  The trial court took the motion under advisement pending a decision by the Supreme Court of North Carolina on the Hughes Group's appeal.  On July 28, 1994, the Supreme Court of North Carolina denied review.  Cole v. Hughes, 447 S.E.2d 418 (N.C. 1994).

Ruling in a letter opinion that under Virginia's choice of law doctrine, the law of the place of making governs the determination of a contract's validity, the trial court concluded that "the law of North Carolina shall govern the validity of the agreement and the obligation between the parties."  The court then held that "[t]he North Carolina courts having decided that the agreement is illegal and against the public policy of North Carolina and is accordingly void and unenforceable in that State, there exists no agreement which may be enforced in Virginia." Alternatively, the trial court ruled that if North Carolina law did not apply, the agreement was void and unenforceable under Virginia law.

Accordingly, on December 22, 1994, the trial court entered an

order granting summary judgment in favor of the Coles and dissolving the temporary injunction. The court ordered that after withholding taxes, the Lottery Department pay the annual installments on the lottery prize to the clerk of the trial court. After directing the clerk to distribute certain amounts to the Coles' previous counsel to satisfy attorneys' liens for services and expenses, see infra, the court ordered the clerk to distribute the balance of all lottery prize payments to the Coles in accordance with the "Agreement to Share Ownership and Proceeds of Lottery Ticket," which Walter Cole executed in favor of his children on September 16, 1992.[3]

On appeal, the parties debate at length the question whether Virginia law or North Carolina law controls the disposition of this case. The Coles argue that the North Carolina decision declaring the agreement between the parties void and unenforceable should be given full faith and credit, with the result that the Hughes Group is barred by principles of res judicata from prosecuting its cause of action in Virginia.

The Hughes Group points out, however, that the trial court did not decide the case upon full faith and credit grounds but upon choice of law principles. Furthermore, the Hughes Group maintains, the North Carolina Court of Appeals merely ruled that the agreement between the parties was unenforceable in North

_____

[3]The order of December 22, 1994, also dismissed Hercules "Trink" Cole because no basis existed for personal jurisdiction over him. Hercules "Trink" Cole never claimed an ownership interest in the winning lottery ticket and did not file any pleadings or otherwise make an appearance in the proceedings below.

Carolina, and the court specifically left resolution of the ownership of the winning ticket and its proceeds to the Virginia authorities. Hence, the Hughes Group concludes, "[p]rinciples of full faith and credit and res judicata . . . have no application in the determination whether the agreement to share in the proceeds of the winning Lotto ticket is valid in Virginia."

The Coles have not assigned cross-error to the trial court's failure to decide the case on full faith and credit grounds. Rule 5:18. Accordingly, we will consider the case, as the trial court considered it, without reference to the principles of full faith and credit and res judicata. And, in our consideration, we will accept the North Carolina decision as the final word that the agreement is void and unenforceable in North Carolina.[4]

The Hughes Group argues that under applicable choice of law principles, Virginia law should control and that, contrary to the trial court's alternative ruling, the agreement is valid and enforceable under Virginia law. On the other hand, the Coles argue that the trial court applied the proper choice of law rule in determining the validity of the agreement according to the law

[4]The Hughes Group argues that the North Carolina courts did not have subject matter jurisdiction to determine the validity of the agreement in question. We reject the argument. It does not follow from the fact the Superior Court may have lacked in rem jurisdiction over the winning lottery ticket that it also lacked subject matter jurisdiction to determine the validity of the agreement under North Carolina law. The Superior Court is the court of general jurisdiction in North Carolina, with plenary jurisdiction over questions concerning the validity of contracts, N.C. Gen. Stat. § 7A-240 (1994), and, as the Court of Appeals of North Carolina said, "all parties to the agreement [were] North Carolina residents, and they entered into the venture in North Carolina." 442 S.E.2d at 89.

of North Carolina. The Coles also support the trial court's alternative holding that the agreement is void and unenforceable under Virginia law.

In the view we take of this case, if we agree with the Coles that the agreement is void and unenforceable under the law of both North Carolina and Virginia, we would not need to make a choice of law. Because the agreement would be unenforceable under the law of both states, our decision would be to affirm the judgment of the trial court.

It remains to be seen, therefore, whether the agreement is void and unenforceable under Virginia law. At the heart of the problem is Code § 11-14, which provides in pertinent part that "[a]ll . . . contracts . . . whereof the whole or any part of the consideration be money or other valuable thing won . . . at any game . . . shall be utterly void."

The Hughes Group contends that Code § 11-14 "voids only those contracts in which one party to a bet agrees to pay something to another party to that bet as a result of losing the bet." However, the Hughes Group reads the statutory language too narrowly. The language undoubtedly includes the type of contract the Hughes Group cites, but it also includes any contract whereof the whole or any part of the consideration is money won at any game, and this language is broad enough to include the type of agreement that Walter Cole and the Hughes Group entered into here.

The Hughes Group argues, however, that the consideration for the agreement was not based in whole or in part on money won at

any game, but upon the mutual promises the parties made to one another to share in the proceeds should they pick a winning combination of numbers. The Hughes Group says "[i]t is this agreement, and not a gaming contract, that forms the basis for the relief sought by the . . . Group."

But consideration is defined as "[t]he . . . motive . . . or impelling influence which induces a contracting party to enter into a contract." Black's Law Dictionary 306 (6th ed. 1990). To say that the parties to the agreement in this case were motivated or impelled to enter into the contract by any inducement other than to win money in the lottery would be pure sophistry.

Consideration is also defined as the "reason or material cause of a contract." Id. Here, the expectancy of hitting the lottery jackpot was not just the material cause but the sole cause of the agreement; without that expectancy, the venture would never have come into existence. And the whole reason for entering into the agreement was to pool funds so that each player could increase his chances of winning money in the lottery, which is undeniably a game. The agreement constituted, therefore, a gaming contract within the meaning of § 11-14.

The Hughes Group points out, however, that Code § 18.2-334.3 provides that nothing in Article 1 of Chapter 8 of Title 18.2 of the Virginia Code, which article regulates gambling and imposes penalties for illegal gambling, "shall apply to any lottery conducted by the Commonwealth of Virginia." The Group further points out that Code § 58.1-4007(A), a part of Virginia's lottery law, authorizes the State Lottery Board to adopt regulations

governing the conduct of the lottery and that the regulations adopted by the Board permit groups to claim lottery winnings. From all this, the Hughes Group concludes that "[b]ecause under § 58.1-4007, the General Assembly through the State Lottery Board has authorized group claims to the proceeds of winning Lottery tickets, § 11-14 is inapplicable."

We disagree with the Hughes Group. In the first place, it should not be necessary to point out that Code § 11-14 is not a part of Chapter 8, Article 1, of Title 18.2 of the Code and, therefore, that the operation of § 11-14 is unaffected by the provisions of Code § 18.2-334.3. Furthermore, what the Hughes Group is really saying is that by giving the State Lottery Board authority to adopt regulations, the General Assembly intended that the Board would have authority to repeal § 11-14 so far as lotteries are concerned. But that would be repeal by implication. "Repeal of a statute by implication is not favored, and, indeed, there is a presumption against a legislative intent to repeal 'where express terms are not used.'" Albemarle County v. Marshall, 215 Va. 756, 761, 214 S.E.2d 146, 150 (1975) (quoting New Market & Sperryville Turnpike Co. v. Keyser, 119 Va. 165, 170, 89 S.E. 251, 253 (1916)).

Finally, the Hughes Group argues that while Code § 11-14 may make gaming contracts void, the statute does not provide that such contracts are illegal. The Group then states that "[e]ven if the agreement [in question] is a 'gaming contract,' it is not illegal under Virginia law." "Certainly," the Group continues, "the purchase of the Lotto ticket in Virginia was entirely legal."

Furthermore, the Group says, "[o]ther state courts have routinely upheld agreements to share in the proceeds of a lottery ticket purchased in a state or country where the lottery was legal, even though lotteries were illegal in the forum state."[5]

The difficulty the Group faces is that its argument and the out-of-state decisions it cites are at odds with a recent decision of this Court that is directly on point.  Kennedy v. Annandale Boys Club, Inc., 221 Va. 504, 272 S.E.2d 38 (1980), was decided after the General Assembly legalized bingo games conducted by certain nonprofit organizations.  The General Assembly decriminalized bingo games the same way it decriminalized lotteries, by providing that the statutes regulating gambling and imposing penalties for illegal gambling should not apply to the conduct it intended to permit in the future.  See Code § 18.2-335 (1977) (now Code § 18.2-334.2).

Ms. Kennedy sought a judgment for $6,000 she claimed she had won in a bingo game conducted by the Boys Club.  The trial court sustained a demurrer to Ms. Kennedy's motion for judgment, holding that the contract she sought to enforce was void and, therefore, unenforceable under Code § 11-14.  We affirmed, stating as follows:

> By statute, the General Assembly removed the taint of illegality from the operation of a bingo game by certain organizations and under certain conditions, and the taint of illegality from participating in and playing bingo, and in giving and receiving prizes and consideration incident thereto.

[5]The out-of-state cases cited by the Hughes Group are Kaszuba v. Zientara, 506 N.E.2d 1 (Ind. 1987), Miller v. Radikopf, 228 N.W.2d 386 (Mich. 1975), and Castilleja v. Camero, 414 S.W.2d 424 (Tex. 1967).

However, the General Assembly did not repeal or amend Code § 11-14. While its action may be construed as legalizing bingo in that no criminal sanctions can be imposed upon those who either conduct or play the game, it nevertheless did not render valid and enforceable the contract between the operators of the game and those who play. The statute is couched in plain, unambiguous, and strict language. A gaming contract in Virginia is held to be a contract that is <u>utterly</u> void. A void contract is a complete nullity, one that has no legal force or binding effect.

<u>Id.</u> at 506, 272 S.E.2d at 39. The Hughes Group states on brief that the General Assembly "demonstrated its displeasure with the <u>Kennedy</u> trial court's decision by enacting [what is now] Va. Code § 18.2-340.9(H) [and] which provides in pertinent part, 'the award of any prize money for any bingo game or raffle shall not be deemed to be part of any gaming contract within the purview of § 11-14.'" However, the Group does not tell us how it became privy to the information that the General Assembly made the enactment out of displeasure with the trial court's decision. While the enactment was made subsequent to the trial court's decision, it was part of a sizeable overall revision of the statutes relating to bingo games, and nothing can be discerned from a reading of the text to indicate what motivated enactment of the provision. Unfortunately for the Hughes Group, the General Assembly did not include a similar provision when it legalized lotteries.

The Hughes Group cites <u>American-LaFrance & Foamite Indus., Inc. v. Arlington County</u>, 169 Va. 1, 192 S.E. 758 (1937), as an instance where, the Group says, this Court "refused to allow [a party] to avoid its obligation under [a] contract" that was void

because made in contravention of law. The Group, however, misreads our opinion. Indeed, we did not enforce the contract in American-LaFrance, and what we said there actually supports the action we take here.

In American-LaFrance, Arlington County purchased fire-fighting equipment under a contract calling for a certain amount down with the balance to be paid in one, two, and three years. Title to the equipment was reserved in the seller until the purchase price was paid in full. The County made the down payment and one of the installments, but refused to pay the remainder because the contract had not been approved by the voters as required by statutory and constitutional provisions. The County continued to use the equipment even after it refused to pay the balance due.

The seller filed with the County Board a claim for the rental of the equipment and a demand for its return. Upon the Board's denial, the seller appealed to the circuit court. The County filed a plea asserting that the entire transaction was illegal, contrary to public policy, and void. The trial court held that the seller was not entitled to any compensation for the use of the equipment or to its return but was entitled to a sale of the equipment, with the proceeds applied to the balance of the purchase price due under the contract.

> Both sides appealed. This Court reversed, stating that [i]f [a] contract is . . . merely invalid, or is based upon a transaction involving no moral turpitude, and is simply contrary to some legal provision relating to the manner, method, or terms of its performance, with no penalty provided other than its invalidity, the court will not require performance of either the express

> contract or a contract by implication. In the latter class of cases, the courts have not declined to undertake to restore the status quo of the parties where in doing so no injustice is done to either party. The effort of the court is to promote justice and honesty without giving recognition to the contract.

Id. at 9, 192 S.E. at 761 (emphasis added). The Court stated that while the contract in dispute was "merely invalid and void, and not illegal[,] neither party [could] rely upon [it], or upon any of its provisions." Id. at 10, 192 S.E. at 762. However, recognizing "the duty of the courts to render impartial justice and to implant the spirit of common honesty in dealings between men," id. at 14, 192 S.E. at 763, the Court held that the equipment "should be returned to its owner, with consideration given both to compensation for its use while retained by the county, and to the payments made by it. We cannot lend our aid to promote any other condition any more than we can enforce the invalid contract," id. at 15, 192 S.E. at 764.

There is simply no similarity between the situation in American-LaFrance and the circumstances of the present case. A return to the status quo here, i.e., a refund of the $10 contribution each member made to the purchase of lottery tickets, could not possibly be of any interest to the Hughes Group. Furthermore, to promote honesty and justice, we must give recognition to the agreement in dispute here, and this we are forbidden to do by both Code § 11-14 and American-LaFrance.

Accordingly, we will affirm the trial court's action in granting the Coles' motion for summary judgment and dissolving the temporary injunction.

## Cole v. Twiford

On September 16, 1992, after the Lottery Department refused to disburse the proceeds of the winning ticket to Walter Cole, the Coles retained Russell E. Twiford of the North Carolina law firm of Twiford, Morrison, O'Neal and Vincent. With the Coles' consent, Twiford associated Peter G. Decker, Jr., and H. Joel Weintraub of the Norfolk, Virginia firm of Decker, Cardon, Thomas, Weintraub, Coureas and Huffman. Pursuant to a fee agreement signed by the Coles, Twiford and Decker were to divide evenly a contingent fee equal to one-third of 80 percent of the amount recovered, plus expenses (no fee was to be charged against the undisputed claim of Walter Cole to 20 percent of the lottery proceeds).

By letter dated April 25, 1993, while the appeal of the Hughes Group was pending in the North Carolina Court of Appeals, the Coles dismissed Twiford and Decker. The letter gave no reason for the dismissal but requested a bill for services rendered and ended with the statement, "[w]e wish to thank you for your services on our behalf."

On April 26, 1993, the Coles retained Frank W. Ballance, Jr., of the North Carolina firm of Frank W. Ballance, Jr. and Associates, P.A. and, in a fee contract, agreed to pay him a contingent fee equal to 15 percent of 80 percent of the amount recovered, plus expenses. With the Coles' agreement, Ballance associated John H. Harmon of New Bern, North Carolina, and Henry L. Marsh, III, of the Richmond, Virginia firm of Hill, Tucker and Marsh.

By letter dated July 5, 1993, the Coles dismissed Ballance and Marsh. Again, no reason was given for the dismissal but a bill for services rendered was requested and the letter ended with the statement, "[w]e wish to thank you for your services on our behalf." The Coles then retained Bryan K. Selz of the law firm of Overbey, Hawkins and Selz of Rustburg, Virginia. Finally, the Coles replaced Selz with their present counsel, J. Nelson Happy of the law firm of Happy, Mulkey and Warley of Newport News, Virginia.

Twiford, Decker, Ballance, Harmon, and Marsh filed applications in the trial court for the enforcement of attorneys' liens pursuant to Code §§ 54.1-3932 and -3933.[6] The attorneys asserted that they were terminated without cause and requested that the court determine their compensation and order the Lottery Department to pay their fees out of the Coles' share of the lottery proceeds should the Coles prevail on their claim for the proceeds.

---

[6] **§ 54.1-3932. Lien for fees. --** Any person having or claiming a right of action sounding in tort, or for liquidated or unliquidated damages on contract, may contract with any attorney to prosecute the same, and the attorney shall have a lien upon the cause of action as security for his fees for any services rendered in relation to the cause of action or claim. . . .

**§ 54.1-3933. Decreeing fee out of funds under control of court. --** No court shall decree or order any fee or compensation to counsel to be paid out of money or property under the control of the court, unless the claim is in the bill, petition, or other proceeding, of which the parties interested have due notice, or unless the parties are notified in writing that application will be made to the court for such decree or order.

The Department objected to the applications on the grounds (1) that the lottery winnings were exempt under the doctrine of sovereign immunity from any claim by a person other than the prize winner, and (2) that Code § 58.1-4013(A)(ii) provides that lottery prize winnings are not assignable except that "the prize to which the winner is entitled may be paid to a person pursuant to an appropriate judicial order." The Coles joined in the Department's objections and also denied that the attorneys were terminated without cause.

Under date of December 15, 1994, the Office of the Attorney General submitted a letter to the court which stated as follows:

> [T]he Lottery does not object to the entry of an order directing it to pay the proceeds of the [winning] ticket into court for further distribution, but it vigorously objects to the lodging of a lien against those monies while they are still in the hands of the Director of the Lottery . . . .

Ruling that the attorneys were discharged without cause, the trial court awarded compensation on the basis of quantum meruit in the amount of $850,000 to Twiford and Decker and $115,000 to Ballance, Harmon, and Marsh. The court granted the applications for the enforcement of attorneys' liens and ordered that the Department distribute the lottery prize payments to the clerk of the court for further distribution in accordance with the court's decrees.

The court noted in its decrees that "the Lottery does not object to the entry of an Order directing it, acting through its Director, to pay the proceeds of the prize, in annual installments as they become due and payable, to the Clerk of this Court for

further distribution by the Court."  The decrees ordered the clerk to distribute certain amounts from the annual installments to the attorneys until their judgments for attorneys' fees were satisfied.  The second decree also provided that "in accordance with the request of [the Coles], the Court further ORDERS and DIRECTS the Clerk of this Court to distribute to J. Nelson Happy, attorney for [the Coles], the sum of $110,000 in partial payment of attorney's fees due."

On appeal, the Coles contend that the trial court erred in awarding any amount of attorneys' fees in this case because "the evidence showed that both sets of attorneys were discharged for cause."  However, the Coles have waived any objection they may have had to the trial court's determination that Twiford and Decker were discharged without cause.  Rule 5:25.

Twiford and Decker's application was heard separately from Ballance, Harmon, and Marsh's.  At Twiford and Decker's application hearing, Leondas Cole, who acted as spokesman for the Coles, testified in response to a question from Twiford and Decker's counsel:  "As far as you guys earning the fee, I think you guys deserve to be paid for what you did, but I think that the price that you are asking is astronomical."  More important, in closing argument, the Coles' counsel stated that he did not "think for a minute that [Twiford and Decker] should walk out with zero from this case," and he requested the court to apply "some reasonable hourly rate . . . to some reasonable amount of time."  In view of these unequivocal concessions, the Coles cannot ask this Court to hold that Twiford and Decker were dismissed for

cause and, therefore, that they are entitled to no award of fees.

With respect to Ballance, Harmon, and Marsh, Walter Cole was asked at their application hearing why he discharged Ballance. Cole said: "Well, because he didn't do like I tell him to do. . . . I told him we are not going to settle. He told me he was going to the lottery to get the money, and he didn't do neither what I asked him to do." Hercules Cole testified that Ballance did not respond to telephone calls and did not provide the Coles with paperwork showing what actions counsel had taken.

The first ground asserted by the Coles for their discharge of Ballance, concerning the subject of settlement, involves an article published in the Virginian-Pilot, a Norfolk newspaper, on May 21, 1993. In the article, Ballance was quoted as saying: "'My goal is to sit the parties down and determine whether a reasonable settlement can be reached. . . . I'm not sure to what extent that's been done. They were all friends at one time and they're not getting any younger.'"

Walter Cole, Hercules Cole, and the latter's wife, Elsie Cole, testified that when the Coles initially met with Ballance in April 1993, Walter Cole told Ballance he did not want to settle the case. The Coles argue that Ballance's statement as quoted in the newspaper article was in direct violation of Walter Cole's instruction.

Yet, the fee contract the Coles signed authorized Ballance "to negotiate with those claiming an interest, such settlement or compromise as he may deem appropriate, subject however to [the Coles'] approval." The mere statement by Ballance of an intention

to determine whether settlement could be reached, which is all the record discloses he ever said, is not a breach either of the contract or of Walter Cole's instruction. Indeed, we are inclined to agree with Ballance that this assertion by the Coles "is totally frivolous."

The second ground asserted by the Coles for their discharge of Ballance involves an alleged failure by Ballance to follow the Coles' instruction "to obtain a court order releasing the uncontested portion of the prize (approximately $150,000 per year)." The Coles say that after they retained their present counsel, J. Nelson Happy, it only took him from October 27, 1993, to January 12, 1994, to obtain the release of one-sixth of the lottery prize. The Coles complain that as a result of Ballance's failings, they lost the use of their funds and were denied interest on the money.

Ballance testified that after reviewing the file following his employment in the case, he developed a plan for representing the Coles which consisted of filing a brief in the North Carolina Court of Appeals, attempting to secure the undisputed amount of the winnings, and proceeding to obtain the full $9 million for the Coles as soon as possible. Ballance said he "informed [the Coles] that in [his] opinion [they] needed to proceed with the brief and hold other issues until after the brief had been filed and after the case had been argued [in the North Carolina Court of Appeals]."

Ballance testified further that he "asked [Marsh] to secure [the] release [of] the [uncontested] funds [from the Circuit Court

of the City of Chesapeake]."  After the appellate brief was filed, Marsh spoke to the trial judge who told Marsh that at the last hearing of the case, while Twiford and Decker were still representing the Coles, a request was made to release the uncontested amount of the award.  The judge indicated to Marsh that the issue of releasing the undisputed funds "was still before the court and would likely be taken up at the next hearing before the court."  Marsh testified that the Coles terminated his services before he was able to file a motion to bring the matter before the court.

We think the standard by which the timeliness of Ballance and Marsh's actions should be judged is set by the Coles' boast that it only took their present counsel from October 27, 1993, to January 12, 1994, or a total of 78 days, to secure the release of the undisputed funds.[7]  Considering that Ballance and Marsh were only in this case a total of 71 days before their discharge, or seven days short of the Happy standard, we fail to see how the Coles can feel justified in disparaging the actions of Ballance and Marsh.  Be that as it may, the testimony of Marsh is uncontradicted that he spoke to the trial judge about releasing the undisputed funds and that the Coles terminated his services before he was able to file a motion to bring the matter before the court.  Had the Coles not taken such precipitous action, it is

---

[7]We do not understand why the Coles count the period of time it took Happy to secure the release as beginning on October 27, 1993, when he had been in the case since at least September 17, 1993, as shown by a letter he wrote opposing counsel on the latter date.

likely they would have received the undisputed money months earlier as a result of Marsh's efforts.

With respect to the complaint of Hercules Cole that Ballance did not respond to telephone calls or provide documentation of the actions he had taken, Ballance testified that when the Coles retained him as counsel, he requested that the family choose one person to act as spokesman, and the family selected Leondas Cole. Ballance testified further that it was his policy to return telephone calls as soon as possible and, despite the agreement that Leondas serve as spokesman, anytime a Cole family member telephoned Ballance and was unable to reach him, he would make an effort to return the call. Ballance did not explain his alleged failure to provide documentation of his actions, but the Coles are unable to point to anything imposing upon him the duty to furnish such documentation. The trial court obviously found, as it had a right to find, that Ballance's explanation about the telephone calls was satisfactory and that the complaint about the lack of documentation was so petty as not to warrant serious attention.

In determining what constitutes just cause for terminating a contract, this Court has stated as follows:

The grounds upon which [a termination] is based must be reasonable, and there should not be an abuse of the conferred right. It must be a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power. It limits the party to the exercise of good faith, based upon just and fair grounds as distinguished from an arbitrary power.

Quick v. Southern Churchman Co., 171 Va. 403, 417, 199 S.E. 489, 494-95 (1938). Tested by these principles, the evidence amply supports the trial court's finding that Ballance and Marsh were

terminated without just cause.

The law is clear that "when . . . an attorney employed under a contingent fee contract is discharged without just cause and the client employs another attorney who effects a recovery, the discharged attorney is entitled to a fee based upon quantum meruit for services rendered prior to discharge and, as security for such fee, to the lien granted by Code § 54-70 [now Code § 54.1-3932]." Heinzman v. Fine, Fine, Legum & Fine, 217 Va. 958, 964, 234 S.E.2d 282, 286 (1977) (footnote omitted).

This brings us to the question whether the trial court correctly determined the quantum meruit value of the services rendered by the two sets of attorneys involved in this appeal. In reviewing the record with respect to this question, we have identified several procedural problems concerning the arguments the Coles make on appeal, as follows.

1. The Coles argue that "[t]he trial court's reliance on the rules which pertain to strictly contingent fees cases was misplaced because the fees were only partially contingent." However, this argument was not made in the trial court, and, furthermore, the Coles did not object to the trial court's finding that the legal work in dispute was to be performed "on a contingency fee basis." Accordingly, we will not consider the argument. Rule 5:25.

2. The Coles also argue that in setting fees, the trial court should have considered the factor that "unlike the typical personal injury case where contingent fees are applicable, this case does not present any issue of collectability of the

judgment."  But this argument was not made at the Twiford and Decker fee hearing, and we will not consider it now as it might have applied to Twiford and Decker.  Rule 5:25.  The argument was made at the Ballance, Harmon, and Marsh hearing, and the trial judge did in fact consider the factor.  Therefore, the argument is moot.

3.    The Coles further argue that "the trial court should have denied [the attorneys'] application for fees or drastically discounted them from the amounts allowed" because none of the North Carolina attorneys "bothered to comply with Rule 2.6 of the North Carolina Rules of Professional Conduct."  This Rule, the Coles say, "requires [an attorney] to make reasonable efforts to advise the client of the existence of the North Carolina State Bar's program of nonbinding fee arbitration."  The Coles did not make this argument, however, at the Twiford and Decker hearing, and we will not consider it now as it might have applied to Twiford and Decker.  Rule 5:25.  The Coles did raise the issue of Ballance's failure to comply with Rule 2.6.  Marsh testified that he and Ballance offered to submit to nonbinding arbitration.  Several weeks later, the Coles agreed to nonbinding arbitration provided it would not delay the proceedings in the trial court.  But, by letter dated December 14, 1994, and again at the Ballance, Harmon, and Marsh fee hearing, the Coles stated they did not wish to proceed with nonbinding arbitration.  Hence, the point has been waived.

The only argument remaining for the Coles regarding the fee allowances is that the amounts awarded are excessive.  The Coles

maintain that the number of hours estimated by the discharged attorneys on their time sheets was "shocking" and that the case did not involve "complex law or facts."

According to reconstructed time sheets submitted by the attorneys, Decker's hours totalled 607.05, Twiford's 387.3, Ballance's 382, and Marsh's 73. In addition, testimony showed that Harmon worked "in excess of 80 hours." When the Coles' counsel remarked at the Twiford and Decker hearing that the case was "relatively simple," the trial judge responded by saying that he wished the case "had been as simple for [him]." The Coles' counsel then agreed that the case was "not all that simple," that it was "a very complex problem." The trial judge remarked later that he "could see right from the beginning . . . it was not a simple case, and [he] knew . . . it was going to take some time [and] a lot of work," that it "was the kind of case that . . . needed full-time attention."

At the Ballance, Harmon, and Marsh fee hearing, the trial judge noted that when these attorneys came into the case, a brief was due to be filed in the Court of Appeals of North Carolina within 22 days and that, at the time, Ballance, Harmon, and Marsh knew nothing at all "about these complex legal issues." Yet, the judge said, they got the brief filed "as quickly as it possibly could be done given the circumstances." The court also noted that the Coles' present counsel used the brief "to successfully argue" the case in the North Carolina Court of Appeals "on behalf of [his] clients."

<u>County of Campbell v. Howard</u>, 133 Va. 19, 112 S.E. 876

(1922), was cited to the trial court and is cited here as a catalog of the factors that should be considered in determining the *quantum* *meruit* value of attorneys' fees. In *Howard*, this Court listed the factors as follows:

> [T]he amount and character of the services rendered; the responsibility imposed; the labor, time and trouble involved; the character and importance of the matter in which the services are rendered; the amount of the money or the value of the property to be affected; the professional skill and experience called for; the character and standing in their profession of the attorneys; and whether or not the fee is absolute or contingent, it being a recognized rule that an attorney may properly charge a much larger fee where it is to be contingent than where it is not so. The result secured by the services of the attorney may likewise be considered; but merely as bearing upon the consideration of the efficiency with which they were rendered, and, in that way, upon their value on a *quantum* *meruit*, not from the standpoint of their value to the client.

*Id.* at 51, 112 S.E. at 885. *Accord* *Wood v. Carwile*, 231 Va. 320, 324, 343 S.E.2d 346, 348 (1986).

From the record, it is clear that the trial judge was fully conversant with the *Howard* factors and that he applied them carefully in determining the *quantum* *meruit* value of the services rendered to the Coles by the two sets of attorneys involved in this appeal. This determination was in the sound judicial discretion of the trial judge and, upon this record, we cannot say that he abused his discretion. *See* *Perrow v. Payne*, 203 Va. 17, 30, 121 S.E.2d 900, 909 (1961). Therefore, we will not disturb the determination.[8]

_____

[8]The Coles argue that "[i]f [Ballance, Harmon, and Marsh] had not been discharged for cause, then the maximum *quantum* *meruit* value of their work in writing [the appellate] brief was between $9,750 and $12,750, not $115,000." These figures are derived from the testimony of John Tuskey, an expert witness called by the Coles. He

The Coles' final contention is that the trial court erred in granting liens against lottery payments in favor of the discharged attorneys because the court lacked subject matter jurisdiction. First, the Coles say that the trial court lacked subject matter jurisdiction because "[s]overeign immunity precludes subjecting funds held in the hands of a public official . . . to attachment." The Coles liken an attorney's lien to an attachment and then argue that "lottery prize winnings . . . are, therefore, immune from attachment, including the attachment pursuant to the attempted assertion of an attorney's lien."

The ready answer to this argument is that the Coles lack standing to assert the sovereign immunity of the Commonwealth. Only the Commonwealth may assert its immunity. Although the Lottery Department initially objected to the applications for fees on the ground that the lottery winnings were exempt under the doctrine of sovereign immunity, it later modified its position by stating it would "not object to the entry of an order directing it to pay the proceeds of the [winning] ticket into court for further distribution." The Lottery Department also said "it vigorously object[ed] to the lodging of a lien against those monies while they are still in the hands of the Director of the Lottery," but the trial court honored the objection by enforcing the attorneys' liens only after the lottery proceeds were in the hands of the

(..continued)
testified that it should have taken only 65 to 85 hours to draft and file the brief at $150 per hour. However, the trial court was not bound by the testimony of the expert. Rappold v. Indiana Lumbermens Mut. Ins. Co., 246 Va. 10, 15-16, 431 S.E.2d 302, 306 (1993).

clerk of the trial court.

Next, the Coles argue that the trial court lacked subject matter jurisdiction because "there is no provision in the State Lottery Law, Sec. 58.1-4000 et. seq. for payment of State Lottery prize winnings to the prize winner's attorneys or former attorneys."  "Rather," the Coles say, "Sec. 58.1-4013 provides that State Lottery prize winnings are not even assignable."[9]

There are two answers to this argument.  First, the trial court's order directing payment to the attorneys does not constitute an assignment.  According to Black's Law Dictionary 119 (6th ed. 1990), an assignment is "[t]he act of transferring to another all or part of one's property, interest, or rights."  In other words, an assignment is a voluntary act, quite unlike a court order that directs the involuntary transfer of property, interest, or rights.  Second, while § 58.1-4013 does provide that "[n]o right of any person to a prize drawn shall be assignable," the section goes on to provide that "the prize to which the winner is entitled may be paid to a person pursuant to an appropriate judicial order."  We think this language clearly authorizes the order the trial court entered in this case.

Finally, the Coles say that the trial court lacked subject matter jurisdiction to grant attorneys' liens to North Carolina lawyers who performed legal work outside Virginia.  However, as

_____

[9]If we were to accept the Coles' argument at face value, we would have to say that the trial court erred not only in directing the clerk to pay the fees of the discharged attorneys from the funds held by the court but also in directing the clerk to pay the fees of the Coles' present attorney from such funds.

will be observed by a reading of Code § 54.1-3932, note 6 _supra_, "_any_ _attorney_ [employed] to prosecute [a claim sounding in tort or in contract] shall have a lien upon the cause of action as security for his fees for _any_ _services_ rendered in relation to the cause of action or claim."  (Emphasis added.)  This language is broad and permits of no interpretation limiting the benefits of the statute to Virginia lawyers or to legal work performed in Virginia.

Finding no reversible error in either _Hughes v. Cole_ or _Cole v. Twiford_, we will affirm the judgments in both cases.

Record No. 950520 -- _Affirmed_.
Record No. 950513 -- _Affirmed_.