COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Chaney, Callins and White
Argued by videoconference


AHMAD AZAMY

MEMORANDUM OPINION* BY
v.      Record No. 1574-22-4      JUDGE KIMBERLEY SLAYTON WHITE
APRIL 23, 2024

ICON FINANCE, LLC


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Jonathan C. Thacher, Judge Designate

Dirk McClanahan (McClanahan Powers, PLLC, on brief), for
appellant.

A. Charles Dean (Jeffrey S. Romanick; Gross, Romanick, Dean &
DeSimone, P.C., on brief), for appellee.


Ahmad Azamy appeals the trial court's ruling that the loan agreement he entered into

with Icon Finance was not a gaming contract. Azamy argues that the contract was a gaming

contract and therefore void under Code § 11-14. Azamy also argues that the interest rate of the

contract was above 12% per year and therefore usurious under Code § 6.2-303. For the

following reasons, we affirm the trial court's judgment.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

In early 2020, Ahmad Azamy reached out by email to Icon Finance, LLC[2] to ask about securing a loan from them. He indicated that he needed "liquidity" and that he was "pursuing investments," "pay[ing] off a number of existing debts," and seeking a "poker bank roll." In additional emails, Azamy stated that "he was using the funds for investment and to deal with short-term liquidity." Azamy said that "he was going to use the loan proceeds for commercial purposes." In an email written just before they entered an agreement, Azamy stated that he was investing the loan money. Initially, Azamy sought a loan of $25,000 but later increased his request to $30,000. Azamy told Fred Gumbinner, the managing partner of Icon Finance, that "he had a variety of business opportunities that he was involved with" and that "he had a good job" and expected a job bonus.[3] Azamy indicated that he believed an interest rate for the loan of 20% "could be a reasonable amount."

Eventually Azamy and Icon Finance came to an agreement. Pursuant to the agreement, Azamy signed a promissory note, titled the "Secured Confession of Judgment Promissory Note," and was issued a short-term loan of $30,000 by Icon Finance. The note, which Azamy signed in April of 2020, had a maturity date of December 31, 2020. Azamy was required to make monthly payments of $1,000 beginning July 5, 2020, before paying the full remaining principal and interest by the note's maturity date. Under the terms of the agreement, the payments were to be made from Azamy's "regular monthly income." The interest rate under the loan agreement was

---

[1] "On appeal, we view the evidence 'in the light most favorable to the prevailing party below and its evidence is afforded all reasonable inferences fairly deducible therefrom.'" *Bedell v. Price*, 70 Va. App. 497, 500-01 (2019) (quoting *Bristol Dep't of Soc. Servs. v. Welch*, 64 Va. App. 34, 40 (2014)). In this case, the prevailing party is Icon Finance.

[2] Icon Finance, LLC is an entity that provides commercial loans and makes investments.

[3] Azamy at the time of contracting with Icon Finance and at trial was an IT engineer, employed full time.

2.5% per month, with an increase to 3.5% in the event of a default. Extrapolated to an annual rate, 2.5% per month equals 30% per year.

The loan agreement contained the following provision under a subheading titled "Mandatory Prepayments":

> Maker shall give Holder an assignment of and security interest in Maker's anticipated annual bonus ("K12 Bonus") from maker's employer K12, which is anticipated to be in excess of $9,000. The entire amount (100%) of such K12 Bonus is a mandatory prepayment shall be used to satisfy Obligations and pay down the loan.

Loan Agreement, Section 1(A).

> In addition, Maker shall pay to Holder a minimum of twenty-five percent (25%) of any gaming winnings that Maker earns, which amounts shall be calculated and paid [on a weekly basis][4] (Monday through Sunday).

Loan Agreement, Section 1(B).

The loan agreement established the collateral for the loan as being:

> [A] security interest in (a) all of the assets of Maker, (b) Maker's wages from K12 (c) the K12 Bonus; and all of the proceeds of any of the above (collectively, the "Collateral").

The loan agreement also contained, in all caps, the statement that "EACH MAKER ACKNOWLEDGES THAT THE TRANSACTION, OF WHICH THIS NOTE IS A PART, IS A COMMERCIAL TRANSACTION . . . ."

Azamy made a single payment of $1,000, but otherwise failed to pay the amounts due. Icon Finance sent a formal notice of default, and the parties restructured the loan to help Azamy be able to fulfill his obligations, but he still did not pay. Icon Finance then brought this action in

---

[4] The words "on a weekly basis" do not appear in the record because it is covered by an exhibit sticker, but Azamy claims in his opening brief that these are the words in the provision. Icon Finance does not challenge this representation in its brief.

the Circuit Court of Fairfax County asserting claims for breach of contract, and, in the alternative, "[q]uantum [m]eruit/[u]njust [e]nrichment,"[5] actual fraud, and constructive fraud.

The case proceeded to a bench trial, at which the parties focused on relatively narrow grounds. Azamy did not contest Icon Finance's assertions that the loan agreement existed and that Azamy had failed to pay; rather, Azamy argued that the loan agreement was void and unenforceable because it violated two provisions of Virginia law. Because the circuit court ruled for Icon Finance on both issues, and Azamy raises the same two arguments on appeal, a brief summary of both is included herein.

First, Azamy argued that the loan agreement is an illegal gaming contract under Code § 11-14, which prohibits "all contracts . . . whereof . . . any part of the consideration is money . . . won . . . at any game . . . ." Azamy argued that the mandatory prepayment provision directly violates Code § 11-14 because it makes Azamy's gaming winnings part of the consideration for the contract. Icon Finance responded that this provision did not constitute part of the agreement's consideration because it did not impact the ultimate amount Icon Finance could recover under the contract; it merely advanced the payment timeline if Azamy were to win money "gaming." Icon Finance further argued that Code § 11-16.1 exempts certain legal gaming from the purview of Code § 11-14, so the contract reasonably can be read to extend only to such legal gaming. Finally, Icon Finance argued that, in any event, the prepayment provision was severable, if need be, so the entire contract need not be invalidated even if the prepayment provision is void.

---

[5] Count II of the second amended complaint is stated as a single "[q]uantum [m]eruit/[u]njust [e]nrichment" claim, despite the fact that quantum meruit and unjust enrichment are distinct legal theories. The circuit court did not reach the issue of which theory should apply in its final order because it ruled for Icon Finance on the breach of contract claim and concluded that each of the alternative counts (II, III, and IV) were moot.

Second, Azamy argued that the contract's interest rate was illegally high in violation of Code § 6.2-303, which prohibits contracts with annual interest rates above 12%. Icon Finance did not dispute that this rate would exceed the 12% limit in Code § 6.2-303 if that statute applied. Icon Finance argued, however, that the loan agreement was not subject to the 12% interest rate limit in Code § 6.2-303 because Code § 6.2-317 exempts loans of $5,000 or more, where the loan is made "for business or investment purposes" rather than "personal, family, or household purposes." The loan agreement in question was, Icon Finance argued, for a business or investment, not a personal purpose. To support this claim, Icon Finance points to certain parts of the record such as when Azamy stated in an email that he had plans for "investing" the money. Additionally, Section 13(d)(ii) in the contract specifically states that the note is part of a commercial transaction. Finally, Icon Finance points out that it only deals in business loans, not personal loans.

Azamy argued that the loan was a personal transaction, not business. Azamy pointed out that on the loan application under use of funds he wrote down "[l]iquidity, [p]oker bankroll." This, coupled with the fact that Azamy was not a professional poker player, forms the basis of Azamy's argument that the contract was a personal loan.

The circuit court agreed with Icon Finance on both arguments and awarded it a judgment for the unpaid principal and interest ($78,635), plus continuing interest at a rate of 3.5% per month, and attorney fees ($27,201.07). Azamy appeals the circuit court's ruling on both grounds.

ANALYSIS

"We must afford deference to the trial court's factual findings, but we review de novo its application of the law to the facts." *Ferguson v. Stokes*, 287 Va. 446, 450 (2014). "The interpretation of a contract is a question of law that this court reviews de novo." *Bolton v.*

*McKinney*, 299 Va. 550, 554 (2021). "The fundamental question before us in construing a contract is 'what did the parties agree to as evidenced by their contract,' and the 'guiding light' for such construction is 'the intention of the parties as expressed by them in the words they have used.'" *RECP IV WG Land Invs. LLC v. Cap. One Bank (USA), N.A.*, 295 Va. 268, 283 (2018) (quoting *Schuiling v. Harris*, 286 Va. 187, 192 (2013)). To that end, "courts are bound to say that the parties intended what the written instrument plainly declares." *Bolton*, 299 Va. at 554 (quoting *Wilson v. Holyfield*, 227 Va. 184, 187 (1984)).

The Court will "construe [a contract] as written, without adding terms that were not included by the parties. When the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning." *RECP*, 295 Va. at 283 (alteration in original). A contract provision is unambiguous if it is "capable of only one reasonable construction." *Id.* (quoting *Wetlands Am. Tr., Inc. v. White Cloud Nine Ventures, L.P.*, 291 Va. 153, 161 (2016)). A provision will be deemed ambiguous, however, if it can be "understood in more than one way or refers to two or more things at the same time." *Id.* (quoting *Wetlands*, 291 Va. at 161).

## I. Gaming Contract

Azamy contends that the contract is void because it is a gaming contract. Code § 11-14 provides, "[e]xcept as otherwise provided in this section, all . . . contracts and securities whereof the whole or any part of the consideration is money or other valuable thing won . . . at any game . . . shall be utterly void." "To the extent we must consider the meaning and proper reading of governing statutes in reviewing the trial court's actions, this is a question of law subject to *de novo* review." *Rainey v. Rainey*, 74 Va. App. 359, 377 (2022). "A primary rule of statutory construction is that courts must look first to the language of the statute. If a statute is clear and unambiguous, a court will give the statute its plain meaning." *Moreno v. Moreno*, 24 Va. App. 190, 197 (1997).

A gaming contract is "an agreement to engage in a gamble; a contract in which two parties wager something for a chance to win a prize." *Blacks Law Dictionary* 345 (8th ed. 2004). Code § 11-14 "render[s] a gaming contract 'a complete nullity, one that has no legal force or binding effect. It is one which never had any legal existence or effect, and one which cannot in any manner have life breathed into it.'" *Coghill v. Boardwalk Regency Corp.*, 240 Va. 230, 232 (1990) (quoting *Kennedy v. Annandale Club*, 221 Va. 504, 506 (1980)). "The public policy of Virginia with respect to the legal enforcement of gambling debts could scarcely be more forcefully expressed. Code § 11-14 provides that all wagers, loans to pay wagers, and contracts to repay wagers 'shall be utterly void.'" *Id.*

Here, the loan agreement contained a mandatory prepayment provision which listed multiple sources of potential income that, should they manifest, were required to be used to pay down the loan. These potential payments were to pay down the loan amount already borrowed. The mandatory prepayment provision did not provide Icon Finance with additional consideration, but rather with methods required for the repayment of the loan. As stated above, potential "gaming winnings" were a part of this prepayment provision only. In fact, the term "gaming winnings" appears no where else in the agreement. Importantly, the term "gaming winnings" is not listed as security or collateral for the contract.

Azamy heavily relies on *Hughes v. Cole*, 251 Va. 3 (1996). However, that case involved an agreement among parties who had agreed to pool funds together to play specific numbers in the Virginia lottery and to share the winnings. Azamy's reliance is misplaced. *Hughes* defines consideration as "the . . . motive . . . or impelling influence which induces a contracting party to enter into a contract" and the "reason or material cause of a contract." *Id.* at 13. "To say that the parties to the agreement in this case were motivated or impelled to enter into the contract by any inducement other than to win money in the lottery would be pure sophistry." *Id.*

Unlike in *Hughes*, the parties here were not contracting for the purpose of pulling funds together to gamble. This was for a loan to provide liquidity to Azamy in return for a repayment at a specific interest rate. "Consideration is, in effect, the price bargained for and paid for the promise." *Brewer v. First Nat'l Bank of Danville*, 202 Va. 807, 815 (1961). Whether there were poker winnings or job bonuses did not in any way change the obligation of the parties. Icon Finance correctly argues that the prepayment provision simply advances payment, it does not change the payment due. According to the contract, Azamy would have to repay the contract regardless of whether he won or lost any money while gambling. This promise to repay the loan was absolute and in no way conditional on winning a wager or a game.

The prepayment provision was an acceleration process for repaying the money already owed and in no way was it part of the consideration. The provision was by no means a central part of the contract, but an additional means in which to pay it down. This Court finds that this was not "an agreement to gamble" and is not a "gaming contract" under Code § 11-14.[6]

## II. Usury

"Whether a contract is usurious or not is generally a question of fact . . . ." *Richeson v. Wood*, 158 Va. 269, 287 (1932). A party seeking to establish that a contract is usurious must do so "by clear and cogent proof, but the introduction in evidence of a contract expressly providing for a greater rate of interest than the law allows will establish a *prima facie* case." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 602 (1984). Once a prima facie case has been established, "the burden shifts to the opposing party to go forward with evidence which would

---

[6] Because this Court has decided the contract is not a "gaming contract" the issue of the Code § 11-16.1 exception does not arise. Additionally, because the contract is upheld as valid, there is no reason to sever the mandatory prepayment provision as suggested was possible by Icon Finance. While the contract does specifically contain a severability clause, the section at issue has been upheld, rendering severability a moot issue.

bring the transaction within an exception to the usury laws, or to show some other valid reason to avoid their application." *Id.*

Ordinarily, the court's role in interpreting a contract is limited to determining what the "parties agree[d] to as evidenced by their contract, and the guiding light for such construction is the intention of the parties as expressed by them in the words they have used." *RECP*, 295 Va. at 283 (citation and internal quotation marks omitted). But when "determining whether a transaction is usurious, the court has both the right and the duty to probe behind the written instruments and to examine all facts and circumstances which shed light on the true nature of the transaction." *Radford*, 226 Va. at 602.

Under Code § 6.2-303 contracts with annual interest rates above 12% are prohibited, with some exceptions. The parties do not dispute that the loan at issue exceeds this 12% threshold. However, Icon Finance argues that the loan agreement is not subject to the 12% interest rate limit in Code § 6.2-303 because Code § 6.2-317 exempts loans of $5,000 or more, where the loan is made "for business or investment purposes." A loan shall be deemed to be for business or investment (passive or active) purposes if it is not for personal, family, or household purposes. Code § 6.2-317.

The Virginia legislature has expressly declined to cap interest rates applicable to loans in the amount of $5,000 or more for business or investment purposes. *See* Code § 6.2-317(B). The legislature has further provided, with respect to such loans, that "[n]o person shall, by way of defense or otherwise, avail himself of the provisions of this chapter [pertaining to interest and usury], or any other statutory or case law relating to usury or compounding of interest, to avoid or defeat the payment of interest, or any other sum . . . ." *Id.* Considered in their entirety, the Virginia statutes applicable to interest rates "indicate a clear legislative intent to permit parties, particularly sophisticated businesses, to set their own interest rates as part of their overall

bargain." *Saul Subsidiary I Ltd. P'ship. v. Best Buy Stores, L.P.*, No. 08-930, 2010 U.S. Dist. LEXIS 14980, at \*7 (D. Md. Feb. 22, 2010) (applying the interest rate statutes previously codified in Title 6.1 of the Code of Virginia).

In this case, the $5,000 threshold has clearly been met, and this Court also finds that the trial court was within its discretion to make the factual finding that the loan was made for business purposes. The record shows that the parties intended for the loan to be a business loan. In fact, the note contains in all caps, the statement that "EACH MAKER ACKNOWLEDGES THAT THE TRANSACTION, OF WHICH THIS NOTE IS A PART, IS A COMMERCIAL TRANSACTION . . . ." In addition, when reaching out to Mr. Gumbinner, Azamy specifically said that he was going to use the loan for "commercial purposes" and to "make investments." He made reference to what might happen "if my plans for investing this money does not work out." Finally, on cross-examination, Azamy admitted that he was "looking to turn a profit" and called the loan "an investment in [him]self."

While there is evidence that Azamy may have intended to use the money partially for gambling, courts have opined that, where the purpose of the gambling is to make money, the gambling is a business. *See, e.g.*, *Rogers v. Wexler*, 2002 U.S. Dist. LEXIS 5457 (N.D. Ill. 2002). *See also In re Garcia*, 606 B.R. 98, 106 (Bankr. D.N.M. 2019) ("debts incurred with a profit motive clearly are not consumer debts"); *In re Johnson*, 546 B.R. 83, 101 n.16 (Bankr. S.D. Ohio 2016) ("A transaction is not a consumer debt when it was incurred with a profit motive.").

The final evidence that this was a business loan, not a personal loan, and therefore falling into the Code § 6.2-317 exception, is that Icon Finance simply does not provide personal loans. Mr. Gumbinner specifically says that Azamy using this as a commercial loan was important to them because "Icon Finance does not do personal loans." Additionally, Mr. Gumbinner's

- 10 -

description of Icon Finance is "a[n] entity that provides commercial loans and makes investments." Under the evidence described above, the court was not plainly wrong in finding that the contract was made for a business purpose, therefore exempt from the usury defense.

Furthermore, the record shows that it was Azamy who actually proposed an interest rate of 20%, close to what ended up in the contract. "In most of the jurisdictions wherein the question has arisen the courts have taken the view that a borrower's initiation of . . . a usurious transaction estops the borrower from setting up the defense of usury." *Heubusch v. Boone*, 213 Va. 414, 421 (1972). The Supreme Court, in following the majority of jurisdictions, reasoned that if a borrower were permitted to assert the defense of usury in such a situation, then the borrower would be able to take advantage of his own wrongdoing. *Id.* Although the Court noted that public policy proscribes usury, the Court stated the following.

"[I]nstances may arise in which the borrower by his conduct or representations induces the lender to enter into a usurious agreement that he would not otherwise have made." *Id.* "The circumstances may be such that to permit the borrower to assert the defense of usury would work a fraud upon the lender, and make the court a party to the fraud." *Id.* Therefore, since Azamy proposed a similar interest rate to that which was charged, this Court finds that "to permit the borrower to assert the defense of usury would work a fraud upon the lender, and make the court a party to the fraud." *Id.*

## CONCLUSION

Azamy and Icon Finance have entered into a valid loan agreement, which Azamy refused to honor. The contract here is not a "gaming contract" as defined by Virginia law and is not void for an unreasonable rate of interest. For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*