COURT OF APPEALS OF VIRGINIA


Present:    Chief Judge Felton,* Judges Humphreys and Haley
Argued at Chesapeake, Virginia


BENITA FRANCES BLACK
                                                    OPINION BY
v.        Record No. 1544-05-1            JUDGE ROBERT J. HUMPHREYS
                                                    APRIL 25, 2006
WILLIAM V. POWERS, JR.


FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
James A. Cales, Jr., Judge

Samuel R. Brown, II (Kaufman & Canoles, P.C., on briefs), for
appellant.

William V. Powers, Jr., *pro se* (Robert Epstein; Epstein, Sandler and
Flora, P.C., on brief), for appellee.


Appellant Benita Frances Black ("wife") appeals a ruling from the trial court upholding

the validity of her prenuptial agreement with appellee William V. Powers, Jr. ("husband"). Wife

contends that the trial court erred in holding that Virginia law governs the validity of the

agreement, reasoning that the trial court should have applied the law of the United States Virgin

Islands, the jurisdiction where the parties signed the agreement, instead. Wife also argues that

the trial court erroneously held that, even under the law of the Virgin Islands, the prenuptial

agreement is valid and enforceable. Finally, wife argues, in the alternative, that if the trial court

correctly held that Virginia law determines the validity of the prenuptial agreement, the court

erred in concluding that the agreement is valid and enforceable under Virginia law. For the

reasons that follow, we hold that the trial court erroneously held that Virginia law governs the

validity of the prenuptial agreement. However, because, according to the law of the Virgin

---

* On April 1, 2006, Judge Felton succeeded Judge Fitzpatrick as chief judge.

Islands, the prenuptial agreement is valid and enforceable, we further hold that this error is harmless. Accordingly, we affirm the judgment below. Also, we deny husband's request for an award of the attorneys' fees associated with this appeal.

## I. BACKGROUND

On appeal, we view the evidence in the light most favorable to husband, the party prevailing below. Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 835 (2003). So viewed, the evidence in this case establishes the following.

Husband and wife began dating in 1979. At the time, wife was employed as a secretary at a law firm, and husband, a lawyer, was a solo practitioner. Both parties were Virginia residents. In late November of 1982, husband and wife decided to buy a house together. Although the parties closed on the house in December of 1982, wife informed husband that she would not move into the house with him unless he married her first. Husband, however, told wife repeatedly that he would never marry her unless she agreed to sign a prenuptial agreement. Although wife then moved some of her belongings into the jointly-owned residence, she did not move into the house herself. Rather, she went to live with her mother.

Several months later, the parties decided to marry, and they selected the island of St. Croix in the United States Virgin Islands as the location of the wedding ceremony. At some point during the spring of 1983, husband gave wife a copy of the proposed prenuptial agreement.[1] Wife, however, did not seek independent legal advice about the terms and conditions of the proposed agreement.

---

[1] Wife consistently testified that she did not receive a copy of the agreement until the day before the wedding. Husband, in contrast, testified that wife had a copy of the agreement "for months in advance." Although the trial court did not expressly resolve this conflicting testimony, we must view the evidence in the light most favorable to husband, the party prevailing below.

On July 10, 1983, the parties flew to St. Croix, and they arranged to be married on July 13, 1983. At the time, neither party had signed the prenuptial agreement. On July 12—the day before the wedding—husband gave wife another copy of the agreement. After a cursory review of the terms of the agreement, wife signed the document.[2] Neither party exchanged tax returns, bank statements, or other financial documents prior to the execution of the agreement.

The prenuptial agreement provides, in pertinent part, as follows:

> Whereas, a marriage is intended to be solemnized between the parties, and in view of the fact that after their marriage, in the absence of any agreement to the contrary, their legal relations and powers with reference to their property may, *by reason of some change in their domicile* or other than those which they desire to have applied to their relationship, power and capacities, and in anticipation thereof they desire to fix and determine the rights and claim [sic] that will accrue to each of them in the property and the estate of the other by reason of the marriage, and to accept the provisions of this agreement in full discharge and satisfaction of such rights.
>
> Whereas, *each of the parties hereto has given a full and frank disclosure to the other the full amount of all property owned by each of the parties and each acknowledges that they are fully acquainted with the business and resources of each and each understands that the other is a person of possible substantial wealth*. And each has answered all the questions each has about their income and assets and each understands that by entering into this agreement they may receive as the widow of each other substantially less than the amount they would otherwise be entitled to receive if they died intestate or if they elected to take against their Last Will and Testament pursuant to statute and each has carefully weighed all the facts and circumstances, and desires to marry each other regardless of any financial arrangements made for their benefits and *each is entering into this agreement freely and voluntarily, on competent independent legal advice and with full knowledge of their rights.*

---

[2] A public notary acknowledged the signatures on the prenuptial agreement when the parties returned to Virginia. The parties agree, however, that notarization was unnecessary and, thus, that the prenuptial agreement became effective at the time it was signed, not at the time that their signatures were acknowledged as valid.

Now, Therefore, In consideration of the promises and of the marriage and in further consideration of the mutual promises and undertakings hereinafter set forth the parties agree:

1.      Each party hereby agrees, covenants and declares that . . . in view and consideration of the proposed marriage, that so far as it is legally possible by their private act and agreement, all the property belonging to either of them at the commencement of the marriage or acquired by or coming to either of them during the marriage, shall be held and enjoyed by him or her, and be subject to his or her disposition as his or her separate property in the manner as if the marriage had never been consummated. . . . .

2.      The parties hereto expressly further agree and covenant to and with each other, that upon the death of either, the survivor shall not have and will not assert any claim, interest, estate or title under the laws of any state because of such survivorship in or to the property, real, personal or mixed, or life insurance, of which the deceased party die seized or possessed, and such survivor hereby relinquishes to the heirs, devisees, administrators, executors and assigns of the deceased party any and all of his or her claim, distributive share, interest, estate or title that he or she would be entitled to as the surviving husband or wife respectfully . . . .
        This provision is intended to and shall serve as a waiver and release of each parties [sic] rights of election *in accordance with the requirement of Virginia Code 64.1-13 (1950 as amended)*, and any law amendatory thereof or supplemental or similar thereto.

3.      Each party hereby waives, releases and relinquishes any and all claim and rights of every kind, nature or description that he or she may acquire by reason of the marriage in the other's property or estate *under the present or future laws of the state of Virginia or any other jurisdiction*.

4.      Nothing contained in this agreement shall be deemed to constitute a waiver by either party of any bequest that the other party may choose to make to him or her by will or codicil. However, the parties acknowledge that no promises of any kind have been made by either of them to the other with respect to any such bequest.

5.      This agreement contains the entire understanding of the parties.  There are no representations, warranties or promises other than those expressly set forth herein.

(Emphases added).  After the wedding ceremony, the parties returned to Virginia, where they

continued to reside throughout the duration of their marriage.

- 4 -

In June of 1994, husband and wife separated. On August 22, 2001, wife filed a bill of complaint, seeking a divorce *a vinculo matrimonii* "on the ground of the continuous physical separation of the parties for a period of more than twelve (12) months without any cohabitation whatsoever." Wife further requested equitable distribution of the marital estate "under § 20-107.3 of the Code of Virginia . . . and [] such other and further relief as the nature of this case may require or as to equity shall seem meet and appropriate."

On October 24, 2001, husband filed an answer and cross bill, asserting, *inter alia*, that "the parties entered into a pre-marital agreement as defined in Virginia Code 20-148 and recognized under section 20-149 and 20-154." Husband further alleged that "said agreement as a matter of law defines their property rights and bars the equitable side of the court from deciding those rights under section 20-107.3."

On January 14, 2002, the trial court conducted a hearing to resolve the validity of the prenuptial agreement. During husband's case-in-chief, both parties testified that the signatures on the prenuptial agreement were valid. At the conclusion of husband's evidence, wife moved to strike the evidence, arguing that there was no evidence that the parties made a "full and frank disclosure" of their financial situation, that there was no evidence that wife signed the agreement "freely and voluntarily," and that there was no evidence that wife "entered into this with competent, independent, legal advice." The trial court overruled the motion to strike.

During rebuttal, wife testified that she stopped working as a legal secretary in 1979, two and a half years before the parties' marriage. Wife also stated that, although she knew what a prenuptial agreement was, she never assisted in the preparation of one during the course of her seven-month employment as a legal secretary. As to the specifics of her prenuptial agreement with husband, wife testified that neither party disclosed their financial assets prior to the signing of the agreement, and she further stated that she had "less than an hour" to review the document.

According to wife, husband did not explain the agreement to her, she did not "take [the] document to anybody" before signing it, and husband did not "advise [her] that [she] should have someone else look at [the] document." Wife also said that she did not have "full knowledge of [her] rights" when she signed the agreement, stating that "all [she] knew is [she] had to sign if [she] wanted to get married." Wife further testified that, before she signed the agreement, husband told her "that he was drawing up a will, and he was leaving everything to me," and she "rel[ied] on that statement" when she decided to sign the agreement. Finally, wife agreed that "it was an emotional expense as opposed to a fiscal expense that was involved" if wife did not sign the agreement and, as a result, the wedding ceremony did not take place.

Husband, however, testified that wife "knew what [his] financial situation was" at the time of the marriage because he discussed his financial situation with her during the loan application process in November of 1982. Specifically, husband stated that both parties orally discussed their assets with the loan application officer, "and we both had to tell her what we were making, and we had to tell her what debts we had." Husband admitted, however, that he could not recall ever giving wife "her own copy" of his tax returns or financial statements. Husband also testified that, at the time the prenuptial agreement was signed, he did not know whether wife had consulted an attorney about the document. Husband said, however, that he gave wife a copy of the agreement "months" before the trip to St. Croix, that he had advised her to speak with an attorney, and that he "had been trying to get her to sign [the agreement] before [they] left" for St. Croix.[3]

During wife's cross-examination, the trial court raised, *sua sponte*, the issue of whether the law of the Virgin Islands should govern the validity of the prenuptial agreement, noting that

---

[3] Wife's brother and sister-in-law also testified that, although they were with the parties in St. Croix, they never heard husband and wife discussing the prenuptial agreement, nor did they witness the signing of the document.

"[t]he marriage took place and the contract was executed there." The court allowed the hearing to proceed, but noted that resolution of this issue would "certainly . . . require briefs on both sides at this point; and it also may require further evidence, depending on what the law was at the time, because we're dealing with what the law was in . . . 1983 in St. Croix."

At the conclusion of the hearing, the trial court opined that, under Virginia law, the agreement "is valid on its face." The court reasoned that, because "it was clear at least for three or four months before they entered into this agreement there was going to be a prenupt," wife "did have the opportunity to at least discuss it with an attorney." Because, in the court's opinion, "there is no evidence of fraud . . . [or] deceit," the trial court concluded that "this was an arm's length contract that should stand on its face."[4] The trial court also held that, even if husband "told [wife] he was going to leave her everything in a will if she signed the agreement," that statement did not constitute fraud in the inducement. Noting, however, that it believed "Saint Croix law is the law that should apply here," the trial court did not expressly rule on the validity of the agreement at that time.

Following briefing and oral arguments on the issue of what law should govern the validity of the prenuptial agreement, the trial court noted that "there is no case in Virginia legally right on point." However, the court also observed that, "where the parties sign a contract in one jurisdiction but clearly expect it to be performed in another and the validity to be governed by another," then the law of the designated jurisdiction should apply. Thus, by order dated July 19, 2002, the court ruled "that Virginia law should apply to this case, that the Pre-Nuptial contract is valid under Virginia law; and that even under Virgin Island law the Pre-Nuptial Contract would

---

[4] We note, however, that Virginia law clearly provides that "[p]arties engaged to be married are not dealing at arm's length," Carpenter v. Carpenter, 19 Va. App. 147, 152, 449 S.E.2d 502, 504 (1994), because they "occupy a confidential relationship toward each other," Batleman v. Rubin, 199 Va. 156, 160, 98 S.E.2d 519, 522 (1957).

be valid." Accordingly, the trial court ordered "that no decree shall be entered inconsistent with this Pre-Nuptial Contract."[5]

By order dated June 1, 2005, the trial court entered a final decree of divorce awarding wife a divorce *a vinculo matrimonii*. The trial court, however, denied wife's request for equitable distribution, reasoning that the parties "waived the same in paragraph 3 of the prenuptial agreement dated July 12, 1983." This appeal follows.

## II. ANALYSIS

On appeal, wife raises three separate, but related, assignments of error. First, wife contends that the trial court should have applied the law of the Virgin Islands when determining the validity of the prenuptial agreement. Second, wife argues that the trial court erroneously held that, under the law of the Virgin Islands, the agreement is valid and enforceable. Third, wife argues, in the alternative, that if Virginia law applies, the trial court erred in holding that the agreement is valid under Virginia law. For the reasons that follow, we affirm the judgment below.

### A.

As a threshold issue, we must determine whether, under Virginia choice-of-law rules, the validity of a prenuptial agreement is governed by the law of the jurisdiction where the agreement was executed (the *lex loci contractus*), or whether it is governed by the law of the jurisdiction where relief from that agreement is sought (the *lex fori*).[6] This represents a pure question of law,

---

[5] Wife attempted to appeal the July 19, 2002 order before entry of the final decree of divorce. Reasoning that the July 19 order constituted a non-appealable interlocutory order, this Court held that we lacked jurisdiction to consider wife's first appeal and, therefore, dismissed the appeal without adjudicating the merits of the case. See Black v. Powers, No. 2022-02-1, 2003 Va. App. LEXIS 549 (Nov. 4, 2003).

[6] Contrary to the position of the concurrence, it is not clear that this agreement would satisfy the test enunciated in Batleman v. Rubin, 199 Va. 156, 98 S.E.2d 519 (1957), for there is no evidence that wife signed the agreement "*on* competent independent advice." Id. at 158, 98

- 8 -

which we review *de novo* on appeal. See, e.g., Piamba Cortes v. Am. Airlines, Inc., 177 F.3d 1272, 1296 (11th Cir. 1999) ("A [trial] court's resolution of a conflict-of-laws issue is a legal question that we review *de novo*."); Gschwind v. Cessna Aircraft Co., 161 F.3d 602, 608 (10th Cir. 1998) ("We review choice of law decisions *de novo*."); Denman v. Snapper Div., 131 F.3d 546, 548 (5th Cir. 1998) ("We review the [trial] court's conflict-of-law determination de novo.").

We hold that, unless the parties clearly intended for the prenuptial agreement to be governed by the laws of a specific jurisdiction, the validity of that agreement—as with any other contract—is governed by the jurisdiction where the agreement was executed, unless the substantive law of that jurisdiction is contrary to the established public policy of the Commonwealth. Because the parties did not clearly intend for Virginia law to govern the validity of the agreement, and because neither party argues that the substantive law of the Virgin Islands regarding prenuptial agreements is contrary to Virginia's established public policies, we hold that the trial court erred in applying Virginia law to resolve the validity of the agreement.[7]

1.

It is a long-standing rule in Virginia that "[t]he nature, validity and interpretation of contracts are governed by the law of the place where [the contract was] made . . . ." C.I.T. Corp.

---

S.E.2d at 521 (emphasis added). Thus, we address the choice-of-law issue because it is not clear that the outcome of this case would be the same under the law of both jurisdictions. Cf. Hughes v. Cole, 251 Va. 3, 12-13, 465 S.E.2d 820, 827 (1996) (noting that, if "the agreement is void and unenforceable under the law of both North Carolina and Virginia, we would not need to make a choice of law" decision, but would simply "affirm the judgment of the trial court").

[7] Husband contends that wife did not argue before the trial court that, under Virginia choice-of-law rules, the law of the Virgin Islands should apply. Husband further argues that wife did not lodge a timely and specific objection to the trial court's ruling that Virginia law should govern the validity of the prenuptial agreement. Accordingly, husband concludes that wife is procedurally barred from arguing this issue on appeal. See Rule 5A:18. We disagree. During oral arguments before the trial court, wife clearly argued that the law of the Virgin Islands should apply. Moreover, wife objected to the July 19 order on the grounds that the trial court "erred in [] finding that the Virgin Islands law did not govern the agreement . . . ." Accordingly, we hold that this issue is sufficiently preserved for purposes of appeal.

v. Guy, 170 Va. 16, 22, 195 S.E. 659, 661 (1938); see also Lexie v. State Farm Mut. Auto. Ins., 251 Va. 390, 394, 469 S.E.2d 61, 63 (1996); Woodson v. Celina Mut. Ins. Co., 211 Va. 423, 426, 177 S.E.2d 610, 613 (1970); Boulware v. Newton, 59 Va. (18 Gratt.) 708, 711 (1868); Fant v. Miller & Mayhew, 58 Va. (17 Gratt.) 47, 59 (1866); Freeman's Bank v. Ruckman, 57 Va. (16 Gratt.) 126, 127 (1860); Nelson v. Fotterall, 34 Va. (7 Leigh) 179, 201 (1836); Banks v. Greenleaf, 10 Va. (6 Call.) 271, 273 (1799).[8]  Thus, when determining the validity of a contract, Virginia courts will generally apply the law of the place where the contract was executed (the *lex loci contractus*).

There are, however, exceptions to this general rule.  First, if the evidence indicates that the parties expressly intended for the law of a specific jurisdiction to govern the validity of the contract, the law of the designated jurisdiction will be applied instead.  See, e.g., Guy, 170 Va. at 22, 195 S.E. at 661 ("The nature, validity and interpretation of contracts are governed by the law of the place where made, *unless the contrary appears to be the express intention of the parties*." (emphasis added)).  Second, if the parties merely sign the contract in one jurisdiction, but, at the time of execution, the parties intend for the contract to be fully performed in another, specific jurisdiction, the law of the place of performance (the *lex loci solutionis*) will be applied rather than the law of the place where the contract was formally executed.  See Arkla Mfg. Co. v. W. Va. Timber Co., 146 Va. 641, 650, 132 S.E. 840, 842 (1926); see also Poole v. Perkins, 126 Va. 331, 337, 101 S.E. 240, 242 (1919).  Third, if the applicable substantive law of the jurisdiction where the contract was executed is contrary to Virginia public policy, Virginia courts

---

[8] Although "[e]verything relating to the *making* of the contract is to be governed by the law of the place where it was made; everything relating to the *performance* of the contract is to be controlled by the law of the place of performance."  Arkla Mfg. Co. v. W. Va. Timber Co., 146 Va. 641, 650, 132 S.E. 840, 842 (1926) (emphases in original); see also Norman v. Baldwin, 152 Va. 800, 805, 148 S.E. 831, 832 (1929) ("The general rule is that while contracts are to be construed according to the *lex loci contractus,* they are to be enforced according to the *lex fori*.").

- 10 -

will not apply the foreign rule of law. See Willard v. Aetna Cas. & Sur. Co., 213 Va. 481, 483, 193 S.E.2d 776, 778 (1973) ("Comity does not require application of another state's substantive law if it is contrary to the public policy of the forum state.").

A prenuptial agreement is, at its most basic, a simple contract. See Pysell v. Keck, 263 Va. 457, 460, 559 S.E.2d 677, 678 (2002) ("Antenuptial agreements, like marital property settlements, are contracts subject to the rules of construction applicable to contracts generally . . . ."); see also Dowling v. Rowan, 270 Va. 510, 516, 621 S.E.2d 397, 439 (2005) (same). Accordingly, the validity of a prenuptial agreement must "be tested by the laws of the place where it is made," Ruckman, 57 Va. (16 Gratt.) at 128, unless: (1) the parties have expressly manifested their intent to apply the law of another jurisdiction, (2) the parties sign the prenuptial agreement in one jurisdiction but, at the time the contract was executed, intend to fully perform the agreement in a different, specific jurisdiction, or (3) the applicable substantive law of the foreign jurisdiction is contrary to Virginia public policy.

Under the circumstances of this case, both parties signed the prenuptial agreement in the Virgin Islands. Thus, the last act necessary to effectuate the agreement—specifically, acceptance of the contractual terms by the offeree—was performed in the Virgin Islands. See O'Ryan v. Dehler Mfg. Co., 99 F. Supp. 2d 714, 718 (E.D. Va. 2000) ("The place of contracting is determined by the place where the final act necessary to make the contract binding occurs."); Madaus v. Nov. Hill Farm, Inc., 630 F. Supp. 1246, 1249 (W.D. Va. 1986) ("[T]he place of acceptance of a proposal is the place where a contract is made, since acceptance by the offeree completes the contracting process."). Accordingly, we hold that the prenuptial agreement was "made" in the Virgin Islands, and, unless one of the above-described exceptions applies, the law of the Virgin Islands governs the validity of the agreement. See Guy, 170 Va. at 22, 195 S.E. at 661.

2.

As noted by the Virginia Supreme Court, "the true test for the determination of the proper law of a contract is the intent of the parties . . . ." Tate v. Hain, 181 Va. 402, 410, 25 S.E.2d 321, 324 (1943) (per curiam) (internal quotations omitted). This intent "may be expressed in the contract itself" or "may be inferred from the surrounding circumstances." Id. (internal quotations omitted); see also Thornhill v. Donnkenny, Inc., 823 F.2d 782, 787 (4th Cir. 1987) ("Virginia conflicts of law rules generally honor contractual choice of law provisions."). Thus, we must first consider whether, at the time the contract was executed, the parties clearly intended for Virginia law to govern the validity of the prenuptial agreement. For the following reasons, we hold that the evidence fails to establish that, at the time the parties executed the agreement, they clearly intended for Virginia law to apply.

Initially, the prenuptial agreement itself does not clearly manifest the parties' intent that Virginia law should govern the validity of the contract. Although the contract mentions Virginia law, it also references the law of other jurisdictions. Specifically, paragraph three of the agreement provides that the parties relinquish any claims they may acquire in each other's property "under the present or future laws of the state of Virginia *or any other jurisdiction*." (Emphasis added). Moreover, the agreement does not contain a forum selection clause or any other stipulation expressly providing that Virginia law governs the validity of the contract. Accordingly, the contract itself does not establish that, at the time the agreement was executed, the parties clearly intended for Virginia law to govern the validity of the contract.

Nor do the circumstances surrounding the execution of the agreement evidence the parties' clear intent that Virginia law would govern the validity of the contract. At the time the agreement was executed, the parties resided in Virginia and jointly owned a residence in Virginia. However, there is no evidence that, at the time the agreement was executed, the parties

- 12 -

intended to remain permanently domiciled in the Commonwealth of Virginia.[9] And, more importantly, because the marriage itself took place in the Virgin Islands, the contract was actually performed, in part, in the Virgin Islands.[10]

Thus, although the parties had significant contacts with Virginia at the time the agreement was executed, the evidence fails to demonstrate that the parties clearly intended for Virginia law to govern the validity of the contract.[11] Accordingly, we hold that the first exception to Virginia's traditional choice-of-law rules, which permits application of the forum law if the parties clearly intended for that law to govern the validity of the contract, is inapplicable under the circumstances of this case.

---

[9] Indeed, in the opening paragraph of the agreement, the parties clearly contemplated a potential change in domicile.

[10] Accordingly, barring a conflict with Virginia's established public policy, the law of the Virgin Islands would govern the validity of the marriage itself. See Ranney v. Ranney, 45 Va. App. 17, 47 n.12, 608 S.E.2d 485, 500 n.12 (2005) ("[I]ssues relating to the validity and voidability of a marriage are generally determined based on the law of the jurisdiction where the marriage was celebrated, barring a conflict with Virginia's established public policy."); see also Farah v. Farah, 16 Va. App. 329, 429 S.E.2d 626 (1993); Kleinfield v. Veruki, 7 Va. App. 183, 372 S.E.2d 407 (1988).

[11] We note that, in deciding to apply Virginia law to resolve the validity of the prenuptial agreement, the trial court relied, at least in part, on an unpublished case in which a Connecticut trial court applied the "most significant relationship" test enunciated in the Restatement (Second) of Conflict of Laws. See Restatement (Second) of Conflict of Laws § 188 (1971). We note that the Virginia Supreme Court has repeatedly declined to adopt the "most significant relationship" test when resolving choice-of-law issues in the context of tort proceedings. See, e.g., Jones v. R.S. Jones & Assocs., 246 Va. 3, 5, 431 S.E.2d 33, 34 (1993); Frye v. Commonwealth, 231 Va. 370, 376, 345 S.E.2d 267, 272 (1986); McMillan v. McMillan, 219 Va. 1127, 1130, 253 S.E.2d 662, 664 (1979). As noted by the Virginia Supreme Court, application of this "more flexible rule" would invariably "creat[e] uncertainty and confusion in application of [Virginia's choice-of-law] theory." McMillan, 219 Va. at 1130, 253 S.E.2d at 664. Because this rationale is equally applicable in the context of a contract dispute, we decline to adopt the "most significant relationship" test in place of Virginia's traditional choice-of-law rules.

3.

As the trial court correctly noted, if the parties merely sign the contract in one jurisdiction, but, at the time of execution, the parties intend for the contract to be fully performed in another, specific jurisdiction, the law of the place of performance will be applied rather than the law of the place where the contract was formally executed.  See Arkla, 146 Va. at 650, 132 S.E. at 842; see also Erie Ins. Exch. v. Shapiro, 248 Va. 638, 640, 450 S.E.2d 144, 145 (1994) ("'It is a general rule that every contract as to its validity, nature, interpretation and effect . . . is governed by the law of the place where it is made, *unless it is to be performed in another place* . . . .'" (quoting Ruckman, 57 Va. (16 Gratt.) at 127) (omissions in original) (emphasis added)); Nickels v. People's Building, Loan & Saving Ass'n, 93 Va. 380, 387-88, 25 S.E. 8, 11 (1896) ("'When a contract is made or entered into in one State, to be performed in another, it is, as a general rule, to be governed by the laws of the place of performance, without regard to the place at which it was written, signed, or dated, in respect to its nature, interpretation, validity, and effect.'"  (quoting Nat'l Mut. Building & Loan Ass'n v. Ashworth, 91 Va. 706, 712, 22 S.E. 521, 522-23 (1895))).  The rationale behind this exception is that, where the parties sign an agreement in one jurisdiction but fully intend for it to be performed in a different jurisdiction, the place of performance is, "in the minds of the parties, the *locus contractus*."  Arkla, 146 Va. at 650, 132 S.E. at 842; see also Nelson, 34 Va. (7 Leigh) at 201 ("[E]very one is understood to have contracted in that place in which he bound himself that he would pay." (internal quotations omitted)).

Here, however, in addition to signing the prenuptial agreement in the Virgin Islands, the parties partially performed the contract in that jurisdiction.  Specifically, according to terms of the contract, the parties agreed to refrain from certain postnuptial conduct in consideration of "the marriage."  By exchanging wedding vows in the Virgin Islands, the parties tendered the

required consideration, thereby performing a portion of their contractual obligations. Thus, because the marriage occurred in the Virgin Islands, the prenuptial agreement was both executed and partially performed in that jurisdiction. Accordingly, we hold that the second exception to Virginia's traditional choice-of-law rules—which permits application of the law of the place of performance if *different* from the law of the place of formal execution—is inapplicable under the circumstances of this case.

4.

Finally, as noted by the Virginia Supreme Court, "[c]omity does not require application of another state's substantive law if it is contrary to the public policy of the forum state." Willard, 213 Va. at 483, 193 S.E.2d at 778; see also Toler v. Oakwood Smokeless Coal Corp., 173 Va. 425, 435, 4 S.E.2d 364, 368 (1939) (declining to apply West Virginia law when determining the validity of a bigamous marriage performed in West Virginia, reasoning that West Virginia law "is repugnant to our statutes, and its substitution for our statutes would be an invasion of the sovereignty of this State"); see also Tate, 181 Va. at 413, 25 S.E.2d at 325-26 (noting that the law of the forum should not be applied merely because it is "different from that of the place of making or performance" of the contract). Here, however, neither party argues that the law of the Virgin Islands, as it pertains to prenuptial agreements, is contrary to Virginia's established public policies. Accordingly, the third exception to Virginia's traditional choice-of-law rules, which permits application of Virginia law when the foreign law is contrary to Virginia's established public policy, is likewise inapplicable under the circumstances of this case.

For these reasons, we hold that the trial court erred in concluding that Virginia law governs the validity of the prenuptial agreement. Regardless, because the trial court correctly

- 15 -

determined that, under the law of the Virgin Islands, the agreement is valid and enforceable, we

further hold that this error is harmless.  Accordingly, we affirm the judgment below.

B.

The Code of the Virgin Islands contains no statutory provisions setting forth the

standards by which the validity of a prenuptial agreement should be determined.[12]  The

legislature of the Virgin Islands has expressly provided, however, that

> The rules of the common law, as expressed in the restatements of
> the law approved by the American Law Institute, and to the extent
> not so expressed, as generally understood and applied in the United
> States, shall be the rules of decision in the courts of the Virgin
> Islands in cases to which they apply, in the absence of local laws to
> the contrary.

V.I. Code Ann. tit. 1, § 4 (2005).  "Local law," as used in this statute, "is not limited to Virgin

Island statute[s], but also includes Virgin Island case law."  Moore v. A.H. Riise Gift Shops, 659

F. Supp. 1417, 1423 (D.V.I. 1987).

Accordingly, to determine the applicable substantive law, we must first look to decisional

case law from the courts of the Virgin Islands.  If the case law of the Virgin Islands fails to

provide guidance as to the validity of this prenuptial agreement, we must next consider the

common law rule as expressed in the applicable Restatement.  Finally, if the Restatement does

not provide a clear statement of the governing rule of law, we must ascertain and apply the

common law as "generally understood and applied in the United States."  V.I. Code Ann. tit. 1,

§ 4; see also Miller v. Christian, 958 F.2d 1234, 1237 (3d Cir. 1992) (noting that, "[w]here there

---

[12] The Virgin Islands, formerly known as the Danish West Indies, is an organized, unincorporated territory of the United States with an independent legislature, executive branch, judiciary, and code of laws.  See Revised Organic Act of the Virgin Islands, Pub. L. No. 83-517, 68 Stat. 497 (1954) (codified as amended in scattered sections of 48 U.S.C.) (establishing executive, legislative, and judicial branches of government); see also Convention Between the United States and Denmark, Cession of the Danish West Indies, U.S.-Denmark, Aug. 4, 1916, 39 Stat. 1706.

is no governing local law or precedent," a court applying the law of the Virgin Islands must "'examine the common law *first* as expressed in the Restatements, and *then* as generally understood and applied in the United States'" (quoting Polius v. Clark Equip. Co., 802 F.2d 75, 77 (3d Cir. 1986)) (emphases added)).

In Dysart v. Dysart, 45 V.I. 118 (2002), a territorial court of the Virgin Islands noted that the issue of whether a prenuptial agreement "is valid and enforceable in the Virgin Islands . . . has not been addressed in any reported decision in this jurisdiction." Id. at 125. The court observed that, "[i]n general, prenuptial or antenuptial agreements have been regarded in favorable terms and recognized as binding upon the parties as any other contractual agreement." Id. at 126.[13] The court further noted that "[t]he interpretation of prenuptial agreements is governed by standard contract principles" and that "[p]renuptial agreements enjoy both a presumption of validity and liberal construction as to their terms so that the intent of the parties may be realized." Id. After applying the "most significant relationship" test from the Restatement (Second) of Conflict of Laws,[14] however, the Dysart court applied Arizona law to resolve the validity of the contested prenuptial agreement. See id. at 126-27 (reasoning that Arizona law should apply because it was "the place of negotiation and execution of the Agreement, . . . the intended residence of the parties, . . . and the location of the separate and community assets of the parties"). Accordingly, other than setting forth the general rule that a prenuptial agreement is presumed valid, see id. at 126, the Dysart opinion provides no guidance as to whether, under the law of the Virgin Islands, the agreement at issue in this case is valid.

---

[13] We note that, consistent with Dysart, a majority of states "no longer hold [that premarital agreements are] inherently void, invalidating only those agreements found defective in execution or result." Robert Roy, Modern Status of Views as to Validity of Premarital Agreements Contemplating Divorce or Separation, 53 A.L.R. 4th 22 (2003) (citing cases).

[14] See note 10, supra.

- 17 -

Because the law of the Virgin Islands does not directly speak to the circumstances under which a prenuptial agreement will be considered valid, we must next consider the common law rule as expressed in the Restatement (Second) of Contracts. See id.; see also Alejandro v. L.S. Holding, Inc., 310 F. Supp. 2d 745, 748 n.2 (D.V.I. 2004) ("The Virgin Islands have adopted the Restatement (Second) of Contracts as the definitive source of decisional contract law, absent any local laws to the contrary."); Tourism Indus. v. Hourigan, 31 V.I. 91, ___ (1995) ("In this jurisdiction, the common law as stated in the Restatement (Second) of Contracts controls in absence of local law to the contrary.").[15]

According to section 124 of the Restatement (Second) of Contracts, "[a] promise for which all or part of the consideration is either marriage or a promise to marry is within the Statute of Frauds . . . ." Thus, to be enforceable, a prenuptial agreement must be in writing and signed by the parties to be bound. See id. A contract that meets these preliminary requirements is presumed valid, see Dysart, 45 V.I. at 126, and, thus, may only be attacked on grounds of fraud, mutual mistake, duress, unconscionability, or the like. See, e.g., Restatement (Second) of Contracts § 152 (providing defense of mutual mistake); id. at § 163 (misrepresentation); id. at § 164 (fraudulent inducement); id. at §§ 174-75 (duress); id. at § 177 (undue influence); id. at §§ 189-91 (violates public policy); see also Govia v. Burnett, 45 V.I. 235, 242 (2003) ("Because the parties' [] agreement is a binding and enforceable contract, only the existence of fraud,

_____

[15] The American Law Institute published the Restatement (Second) of Contracts in 1981, two years before the prenuptial agreement was executed. Accordingly, we need not address whether the courts of the Virgin Islands would apply the Restatement (First) of Contracts to resolve the validity of a prenuptial agreement executed prior to 1981. Cf. Remole v. Sullivan, 17 V.I. 193, 197 (1981) (choosing to apply the common law as expressed in the recently-adopted Restatement (Second) of Contracts rather than "an anachronism from the 1932 Restatement of Contracts"); Clarenbach v. Consolidated Parts, Inc., 17 V.I. 123, 130 (1980) (noting that the Virgin Islands "does not mandate strict adherence to old Restatements which no longer accurately reflect the state of the common law").

mutual mistake, duress, deceit, misrepresentation, or another compelling legal basis will merit the Court reconsidering or setting aside an otherwise valid [] agreement.").

Here, wife concedes that the agreement is both in writing and signed by the parties to be bound. Accordingly, the prenuptial agreement is presumptively valid. See Dysart, 45 V.I. at 126. Wife argues, however, that the trial court erred in upholding the contract because she successfully demonstrated that, pursuant to section 190(2) of the Restatement (Second) of Contracts, the agreement violates public policy. Moreover, wife contends that the circumstances surrounding the execution of the agreement render the contract unenforceable. For the reasons that follow, we disagree.

As pertinent here, section 190 of the Restatement (Second) of Contracts provides that "[a] promise that tends unreasonably to encourage divorce or separation is unenforceable on grounds of public policy." Restatement (Second) of Contracts § 190(2).[16] The underlying purpose of this provision is based on the public interest in the continuation of the marriage relationship. See id. at § 190, cmt. c. Thus, "[a]lthough the parties are free, if they choose, to terminate their relationship under the law providing for divorce or separation, a commitment that tends unreasonably in this direction will not be enforced." Id. So, for example, if "A and B, who are about to be married, make an antenuptial agreement in which A promises that in case of divorce,

---

[16] Similarly, section 190(1) of the Restatement provides that "[a] promise by a person contemplating marriage . . . is unenforceable on grounds of public policy if it would change some essential incident of the marital relationship in a way detrimental to the public interest in the marriage relationship." According to the publisher's comments, section 190(1) "does not prevent persons contemplating marriage . . . from making contracts between themselves for the disposition of property, since this is not ordinarily regarded as an essential incident of the marital relationship." Restatement (Second) of Contracts § 190, cmt. a. It does, however, "preclude them from changing in a way detrimental to the public interest in the relationship the duty imposed by law on one spouse to support the other." Id. Regardless, wife does not argue that the prenuptial agreement at issue in this case changes an "essential incident of the marital relationship," contending instead that the contract "tends unreasonably to encourage divorce or separation."

- 19 -

he will settle $1,000,000 on B," the court may decide, after considering all of the circumstances, that, "in view of the large sum promised, A's promise tends unreasonably to encourage divorce and is unenforceable on grounds of public policy." Id. at § 190, illus. 5.[17]

Wife, citing the above-quoted example, contends that "[i]f a large sum promised would encourage divorce, a zero sum would do so as well." We disagree. The mutual elimination of property rights does not affirmatively encourage parties to separate or divorce. Although such an agreement may simplify division of the parties' assets in the event of divorce, it falls far short of providing a financial incentive to end the marital relationship. Indeed, as noted in the Restatement, "[a] promise that merely disposes of property rights in the event of divorce or separation does not of itself tend unreasonably to encourage either." Id. at § 190, cmt. c. Accordingly, we hold that the prenuptial agreement at issue in this case does not unreasonably encourage divorce or separation and, therefore, does not violate the public interest in maintaining the marital relationship. Cf. Neilson v. Neilson, 780 P.2d 1264, 1269 (Utah Ct. App. 1989) (adopting Restatement view and invalidating clause in prenuptial agreement providing that, in the event of divorce, wife would receive one-half of husband's stock in a particular corporation, reasoning that, "[b]ecause this is the result regardless of how long the marriage lasted, this term

---

[17] For cases applying this general rule, see In re Marriage of Noghrey, 215 Cal. Rptr. 153, 156 (Ct. App. 1985) (invalidating on public policy grounds a clause in a premarital agreement that, in essence, "constitute[d] a promise by the husband to give the wife a very substantial amount of money and property, *but only upon the occurrence of a divorce*," reasoning that wife "is encouraged by the very terms of the agreement to seek a dissolution, and with all deliberate speed, lest the husband suffer an untimely demise, nullifying the contract, and the wife's right to the money and property" (emphasis in original)); Matthews v. Matthews, 162 S.E.2d 697, 699 (N.C. Ct. App. 1968) (refusing to enforce an antenuptial agreement providing that, if husband "ever left" wife, she would receive all of his property, both marital and separate, reasoning that, if the contract were valid, "it would induce the wife to goad the husband into separating from her in order that the agreement could be put into effect and she could strip him of all his property"); Gross v. Gross, 464 N.E.2d 500, 506 (Ohio 1984) (noting that a prenuptial agreement violates public policy if the contract "provides a significant sum either by way of property settlement or alimony at the time of a divorce, and after the lapse of an undue short period of time one of the parties abandons the marriage or otherwise disregards the marriage vows").

of the parties' agreement provides [wife] a $400,000 profit incentive . . . to seek dissolution of the marriage at the earliest possible date").

Wife also argues, however, that "the manner in which [the agreement] was executed render[s] it unenforceable under Virgin Islands law." Specifically, wife contends that, "[i]n determining the enforceability of the Agreement, a review of the fairness of the Agreement and the fairness of the circumstances surrounding the execution of the Agreement is necessary." Wife cites to the alleged lack of "access to independent counsel prior to consent to an execution of the contract" and the "short period" that elapsed from the time that wife saw the agreement "for the first time and her marriage the following day."

The Restatement (Second) of Contracts does not specifically discuss whether a prenuptial agreement may be invalidated for reasons other than the defenses specifically set forth in its provisions.[18] Cf. Govia, 45 V.I. at 242 (denying motion to set aside a contract where the plaintiff "signed the agreement without any reservations or compunction" and the evidence did not

---

[18] In support of her argument that a majority of jurisdictions consider the circumstances surrounding the execution of the premarital agreement, wife cites to Robert Roy, Enforceability of Premarital Agreements Governing Support or Property Rights Upon Divorce or Separation as Affected by Circumstances Surrounding Execution, 53 A.L.R. 4th 85 (2005) ("Most courts addressing this issue have required fairness of execution regardless of the fairness of a premarital agreement's substantive terms."). The author of this annotation notes that,

> In evaluating the fairness of the circumstances surrounding a premarital agreement's execution, the courts have taken account of various factors, including the nature and complexity of the agreement's terms, the extent of and disparity in assets brought to the marriage by each spouse, the parties' respective age, sophistication, education, employment, experience, prior marriages, or other traits potentially affecting the ability to read and understand an agreement's provisions, and the amount of time available to each spouse to reflect upon the agreement after first seeing its specific terms. The factor most often mentioned, and perhaps given the greatest weight, has been the complaining party's access to independent counsel prior to consenting to the contract terms.

Id. For the reasons discussed in the text, however, we need not decide whether the courts of the Virgin Islands would adopt this approach.

establish "fraud, deceit, coercion, misrepresentation, duress or mutual mistake," reasoning that the plaintiff was not entitled to rescission where she "has simply reevaluated the terms of the [] agreement [and] found them to be unsatisfactory"). Even assuming that a court in the Virgin Islands would consider the circumstances surrounding execution of the agreement, however, wife's arguments would fail. The evidence, when viewed in the light most favorable to husband, establishes that wife received a copy of the proposed prenuptial agreement well in advance of the marriage. Moreover, the evidence, when viewed in the light most favorable to husband, establishes that husband affirmatively encouraged wife to obtain independent legal advice about the proposed prenuptial agreement. Wife, then, both knew that she should obtain independent legal advice about the terms of the contract and had ample time during which to obtain that advice.[19] As the trial court found, the fact that she may have failed to seek independent legal advice does not negate her opportunity to do so. Accordingly, wife's arguments—all of which are predicated on the erroneous factual supposition that she did not receive a copy of the agreement until the day before the wedding—are unavailing.

For these reasons, we hold that the trial court did not err in concluding that the prenuptial agreement is valid and enforceable under the law of the Virgin Islands, and we affirm the judgment below.

---

[19] In this respect, the circumstances of this case are distinguishable from the cases upon which wife principally relies. See Rudbeck v. Rudbeck, 365 N.W.2d 330, 332 (Minn. Ct. App. 1985) (invalidating prenuptial agreement where the "first time [wife] saw the contract was . . . when she was [] asked to sign the document"); Tiryakian v. Tiryakian, 370 S.E.2d 852, 853 (N.C. Ct. App. 1988) (invalidating agreement where the husband did not tell the wife that he wanted to execute a prenuptial agreement until the day before the wedding, when "husband called the wife and asked her to meet him at his attorney's office to execute a legal document," and wife signed the agreement without reading it); In re Marriage of Matson, 705 P.2d 817, 821 (Wash. Ct. App. 1985) (invalidating prenuptial agreement where the parties reviewed a "sample" agreement one week before the wedding and the wife was never encouraged to seek independent legal advice), aff'd, 730 P.2d 668 (Wash. 1986).

C.

Finally, husband has requested an award of the attorneys' fees incurred on appeal. Initially, we note that husband's arguments in support of his request for an award of attorneys' fees primarily focus on wife's prior, interlocutory appeal, which this Court dismissed for lack of jurisdiction. See note 5, supra. Unquestionably, this Court may, in its discretion, award attorneys' fees generated during an appeal to this Court. See, e.g., Gottlieb v. Gottlieb, 19 Va. App. 77, 96, 448 S.E.2d 666, 677 (1994); see also Robinson v. Robinson, 46 Va. App. 652, 671, 621 S.E.2d 147, 157 (2005) (en banc). However, we decline to award attorneys' fees merely because an appellant raised identical issues in an earlier, interlocutory appeal that was dismissed by this Court for lack of jurisdiction. Had husband believed that the interlocutory appeal was frivolous, he should have requested an award of attorneys' fees at that time. And, because the present appeal "addressed appropriate and substantial issues," and "neither party generated unnecessary delay or expense in pursuit of its interests," Estate of Hackler v. Hackler, 44 Va. App. 51, 75, 602 S.E.2d 426, 438 (2004), we deny husband's request for the attorneys' fees he incurred during this appeal.

III. CONCLUSION

For these reasons, we hold that the trial court erroneously applied Virginia law when determining the validity of the prenuptial agreement. However, because, under the law of the Virgin Islands, the agreement is valid and enforceable, we further hold that this error is harmless. Accordingly, we affirm the judgment below. We also deny husband's request for an award of the attorneys' fees he incurred on appeal.

Affirmed.

Felton, C.J., concurring.

I concur with the majority that the antenuptial agreement at issue is valid and enforceable.  In my view, however, the majority errs in holding that only the law of the Virgin Islands is applicable in determining the validity and enforceability of the agreement.  I would hold that credible evidence in the record supports the trial court's judgment that Virginia law governs the validity and enforceability of the agreement and that the agreement is valid under the controlling law in Virginia at the time the agreement was signed.[20]

## I.

As the majority notes, pursuant to Virginia's traditional choice of law principles, "[e]verything relating to the making of the contract is to be governed by the law of the place where it was made."  Arkla Lumber & Mfg. Co. v. West Virginia Timber Co., 146 Va. 641, 650, 132 S.E. 840, 842 (1926).  However, if the evidence indicates that the "express intention of the parties" is for the law of a specific jurisdiction to govern the validity of the contract, the law of the designated jurisdiction will be applied instead.  C.I.T. Corp. v. Guy, 170 Va. 16, 22, 195 S.E. 659, 661 (1938).  If the parties merely sign the contract in one jurisdiction, but at the time of execution, they intend for the contract to be fully performed in another, specific jurisdiction, the law of the place of performance will be applied rather than the law of the place where the contract was formally executed.  See Arkla, 146 Va. at 650, 132 S.E. at 842.

Viewing the evidence in the light most favorable to husband, the prevailing party below, the record reflects that the agreement was prepared and provided to wife in Virginia, well in advance of the marriage; that husband encouraged wife to have it reviewed before signing it; and that husband read the agreement aloud to wife before she signed it.  The agreement itself reflects

---

[20] See Code § 20-149 (enacted in 1985).  See also Batleman v. Rubin, 199 Va. 156, 98 S.E.2d 519 (1957).

- 24 -

that, at the time of its signing on July 12, 1983, the parties both resided in the City of Portsmouth, Virginia. Both parties were employed in Virginia, had recently purchased their marital residence in Virginia, and intended to return immediately to their jobs and families in Virginia following the wedding. The text of the agreement made specific references to Virginia law as the primary law to be applied, reciting expressly in paragraph three that the relinquishment of any claims either party might acquire in the other's property would be governed "*under the present or future laws of the state of Virginia,* or any other jurisdiction." (Emphasis added). The agreement also made specific reference to Virginia Code § 64.1-13, regarding the waiver by each to claim an elective share in the deceased spouse's augmented estate. Moreover, on their return to Virginia following the brief trip to the Virgin Islands for their wedding, the parties acknowledged their signatures to the agreement before a Virginia notary public, thereby ratifying the agreement in Virginia. Accordingly, I would hold that credible evidence in the record demonstrates that the parties intended for the agreement to be governed by Virginia law.

## II.

At the time the parties signed the agreement in 1983 the law of Virginia generally governing premarital agreements was as articulated in Batleman v. Rubin, 199 Va. 156, 98 S.E.2d 519 (1957). In Batleman, a prenuptial agreement, also entered into prior to the enactment of the Premarital Agreement Act in Virginia, was declared invalid. Id. at 164, 98 S.E.2d at 525. In Batleman, the Supreme Court noted:

> To render an ante-nuptial agreement valid, there must be a fair and reasonable provision therein for the wife, or—in the absence of such provision—there must be full and frank disclosure to her of the husband's worth before she signs the agreement, and she must sign freely and voluntarily, on competent independent advice, and with full knowledge of her rights.

Id. at 158, 98 S.E.2d at 521 (citing Lindley, Separation Agreements and Ante-Nuptial Contracts, Annotated, Revised Edition, § 90, p.794). In Batleman, two days prior to the wedding, husband asked wife to meet him concerning business, told her he wanted to give her $20,000, and that they needed to go to his lawyer's office to sign some papers. Id. When the parties arrived at husband's lawyer's office, wife was handed a document and asked to sign it. Id. She testified that they were in the office only a few minutes, that "[n]either her intended husband nor the attorney read the contract or explained its provisions to her," and that she signed it because "it was two days before our marriage and I had the utmost confidence in [husband]." Id. at 161-62, 98 S.E.2d at 523. Wife was not given a copy of the signed agreement and "never saw it again until [husband] died." Id. at 162, 98 S.E.2d at 523.

At the time the parties signed the antenuptial agreement in Batleman, wife had little property of value, while husband then was worth nearly $250,000 and had substantial income. Id. at 160, 98 S.E.2d at 522. The court determined that the consideration provided for wife in the antenuptial agreement was unreasonably small in proportion to the value of the property then owned by her intended husband and that proof of those factors created a presumption that she did not know, and was not "fully and frankly informed" by her intended husband of the property owned by him. Id. at 162, 98 S.E.2d at 524. The Court noted that "[t]here is no evidence in the record showing that [husband] made any disclosure to his intended wife as to the value of the property then owned by him, or that she knew the value of such property." Id. It found that husband failed to rebut the presumption that he had not made full disclosure of his property or "that [wife] had knowledge of the value of such property." Id.

In the current case, each party was fully aware of the other's assets and property prior to the signing of the agreement. Indeed, the very terms of the agreement acknowledge as much. The record demonstrates that neither of the parties had any appreciable assets at the time of their

marriage. At the time that the agreement was signed, husband's law practice was just beginning and producing little income. Wife's income was, at most, moderate. Moreover, the parties disclosed their respective financial circumstances to each other when, a few months prior to the time they signed the agreement, they completed a joint mortgage loan application to finance the purchase of their marital residence. Husband's finances were such that he was unable to obtain a loan to purchase the residence based on his financial standing alone.

The trial court found that wife received the proposed prenuptial agreement in Virginia "months in advance" of the actual signing of the document in the Virgin Islands; that she had assisted her brother in preparing an antenuptial agreement; and that she had worked in a law office which regularly handled divorce cases, and where one of the lawyers was a divorce commissioner. The record reflects that wife had ample opportunity to seek independent legal advice concerning the agreement prior to signing it and that husband read the agreement aloud to wife immediately prior to her signing it. Each party was fully aware of the assets of the other, and each mutually promised the other to relinquish any rights to property of the other acquired during the marriage. Accordingly, I would hold that, consistent with law in effect when the parties signed the agreement, the agreement is valid and enforceable under Virginia law.

## CONCLUSION

For these reasons, I would hold that the trial court did not err in its judgment that the antenuptial agreement executed by the parties was a valid and binding agreement under Virginia law.