COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Haley and Petty
Argued by teleconference


STEVEN DOUGLAS NACK

v.        Record No. 2219-06-3

DEBRA DICKERSON EDWARDS NACK

DEBRA DICKERSON EDWARDS NACK

v.        Record No.: 2288-06-3

STEVEN DOUGLAS NACK

MEMORANDUM OPINION[*] BY
JUDGE ROBERT J. HUMPHREYS
SEPTEMBER 11, 2007


FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
Colin R. Gibb, Judge

Edwin C. Stone (Stone & Kellerman, P.C., on briefs), for Steven
Douglas Nack.

Randolph D. Eley, Jr., for Debra Dickerson Edwards Nack.


Steven Douglas Nack ("husband") appeals from a final divorce decree entered August 11,

2006.  Husband argues that the trial court erred by classifying:  (1) a Legg Mason investment

portfolio; (2) a 1987 Mercedes-Benz; and (3) a 1993 Lexus, buffalo, and assorted farm

equipment as marital property.[1]  Wife cross-appeals, arguing that the trial court erred in holding

that the parties' prenuptial agreement barred her from an award of attorney's fees.  For the

following reasons, we reverse the trial court regarding the classification of the Mercedes-Benz

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The farm equipment included a John Deere tractor, a Kawasaki mule farm utility
vehicle, water jugs, a palpation cage, and a "buffalo squeeze chute."

and the Lexus,[2] and affirm the trial court regarding the investment portfolio, buffalo, and farm equipment. We also affirm the trial court regarding wife's request for attorney's fees.

ANALYSIS

Husband contends that the trial court erred by failing to retrace the separate funds that husband contributed to the Legg Mason account, and by classifying the two automobiles, buffalo, and farm equipment as marital property.

When reviewing a trial court's decision on appeal, we view the evidence in the light most favorable to the prevailing party, granting it the benefit of any reasonable inferences. Wright v. Wright, 38 Va. App. 394, 398, 564 S.E.2d 702, 704 (2002). That principle requires us to "'discard the evidence of [husband] in conflict with that of [wife], and regard as true all the credible evidence favorable to [wife] and all fair inferences that may be drawn' from the credible evidence." Wactor v. Commonwealth, 38 Va. App. 375, 380, 564 S.E.2d 160, 162 (2002) (quoting Watkins v. Commonwealth, 26 Va. App. 335, 348, 494 S.E.2d 859, 866 (1998)). An appellate court will not reverse a trial court's equitable distribution "unless it appears from the record that the chancellor has abused his discretion, that he has not considered or has misapplied one of the statutory mandates, or that the evidence fails to support the findings of fact underlying his resolution of the conflict in the equities." von Raab v. von Raab, 26 Va. App. 239, 246, 494 S.E.2d 156, 159 (1997) (quoting Robinette v. Robinette, 10 Va. App. 480, 486, 393 S.E.2d 629, 633 (1990)).

A. Legg Mason

Husband first argues that the trial court erred in failing to retrace the separate funds he contributed to the joint Legg Mason account. Because the Cornerstone account, which later

---

[2] Although husband makes his arguments concerning the Mercedes and the Lexus in two separate questions presented, we address the arguments concerning both vehicles together due to their analytical similarities.

became the Legg Mason account, and the National Life annuity were created around the same time, under nearly identical circumstances, husband reasons the trial court erred in classifying them differently. We disagree.

Code § 20-107.3(A)(2)(i) defines marital property as "all property titled in the names of both parties, whether as joint tenants, tenants by the entirety or otherwise, except as provided by [Code § 20-107.3(A)(3)]," which recognizes the concept of part marital and part separate, or "hybrid" property. See Rahbaran v. Rahbaran, 26 Va. App. 195, 205, 494 S.E.2d 135, 140 (1997). Code § 20-107.3(A)(3) "presupposes that separate property has not been segregated but, rather, combined with marital property." Id. at 207, 494 S.E.2d at 141. When such assets are combined by the contribution of one to another,

> resulting in the loss of identity of the contributed property, the classification of the contributed property shall be transmuted to the category of property receiving the contribution. However, to the extent the contributed property is retraceable by a preponderance of the evidence and was not a gift, such contributed property shall retain its original classification.

Code § 20-107.3(A)(3)(d).

"In order to trace the separate portion of hybrid property, a party must prove that the claimed separate portion is identifiably derived from a separate asset. Whether a transmuted asset can be traced back to a separate property interest is determined by the circumstances of each case[.]" Asgari v. Asgari, 33 Va. App. 393, 402-03, 533 S.E.2d 643, 648 (2000) (citations omitted). However, "if a party 'chooses to commingle marital and non-marital funds to the point that direct tracing is impossible,' the claimed separate property loses its separate status." Rahbaran, 26 Va. App. at 208, 494 S.E.2d at 141 (quoting Melrod v. Melrod, 574 A.2d 1, 5 (Md. App. 1990)). "Even if a party can prove that some part of an asset is separate, if the court cannot determine the separate amount, the 'unknown amount contributed from the separate source

transmutes by commingling and becomes marital property.'" Id. at 208-09, 494 S.E.2d at 141

(quoting Brett R. Turner, Equitable Distribution of Property 268 (1994)).

Here, husband deposited his separate assets from White City and his Fidelity account into

the parties' joint checking account, thereby commingling separate and marital assets.[3] The

parties continuously deposited and withdrew unspecified sums of marital funds from the account.

Husband provided no account balances, deposit slips, cancelled checks, or any other

documentation that would have enabled the court to retrace his separate assets.[4] Thus, in late

1997 and early 1998, when husband and wife withdrew funds from their joint checking account

to acquire their joint Cornerstone account, which later became the Legg Mason account, "the

identity of husband's separate funds had been lost in countless unspecified transactions involving

marital funds, resulting in the irreversible transmutation of separate into marital property."

Asgari, 33 Va. App. at 403, 533 S.E.2d at 648.

The distinction between the Legg Mason portfolio and the National Life annuity is

readily apparent. The Legg Mason accounts were jointly titled, yet the National Life annuity

---

[3] The dissent notes that "[h]usband insists that the parties maintained separate finances and that the accounts at both First Virginia and Cornerstone were *his* accounts, set up as joint accounts purely for convenience." This assertion is of no moment, because wife testified to the contrary at trial, the trial court implicitly accepted wife's testimony over husband's, and our standard of review compels us to view the facts in the light most favorable to wife as the party who prevailed below. Black v. Powers, 48 Va. App. 113, 119, 628 S.E.2d 546, 549 (2006).

[4] In reasoning that the Cornerstone account "included part marital, part separate and part hybrid property," the dissent notes two checks to husband from his parents totaling $10,464.73, deposited into the joint checking account on the same day as the first payment to Cornerstone, and submitted into evidence by wife. In citing these checks as evidence by which the trial court could have retraced a portion of husband's assets, the dissent ignores wife's testimony that these checks represented gifts "put into [their] joint account [and] used for anything." Thus, viewing the evidence most favorably to wife, these checks represent joint gifts made from husband's parents to both husband and wife as a couple, and therefore the checks from husband's parents to husband are not evidence from which the trial court could retrace husband's separate assets. Furthermore, wife testified that these checks were not deposited into the joint account specifically to fund the Cornerstone account.

was titled only in husband's name. The trial court could thus retrace husband's White City funds, which husband deposited into the parties' joint checking account, but later reemerged as distinctly separate assets when husband used them to purchase the separate annuity. Because the Legg Mason accounts were jointly titled, husband was unable to prove that his White City and Fidelity funds regained any separate identity in the Legg Mason accounts, and thus the trial court was unable to retrace these funds as husband's separate assets. The trial court, therefore, did not abuse its discretion by classifying the Legg Mason portfolio as marital property, and we affirm the trial court on this issue.

### B. The 1987 Mercedes and the 1993 Lexus

Husband next argues that the trial court erred in classifying the 1987 Mercedes as marital property, because it was his separate property prior to the marriage, remained titled in his name, and was not a gift. He also argues that the Lexus is his separate property pursuant to the prenuptial agreement. We agree with husband that both automobiles remain his separate property.

Property acquired by either party before the marriage is presumed to remain separate property. See Barnes v. Barnes, 16 Va. App. 98, 104, 428 S.E.2d 294, 299 (1993). As stated above, however, Code § 20-107.3(A)(3)(d) provides:

> When marital property and separate property are commingled by contributing one category of property to another, resulting in the loss of identity of the contributed property, the classification of the contributed property shall be transmuted to the category of property receiving the contribution. However, to the extent the contributed property is retraceable by a preponderance of the evidence and was not a gift, such contributed property shall retain its original classification.

### 1. The Mercedes

In this case, the commissioner recommended the classification of the Mercedes as marital property. In her report, the commissioner noted that around 1999 or 2000, wife began to drive

- 5 -

the 1987 Mercedes SL, a vehicle that had previously "sat in the garage for 10 or 12 years and 'rotted.' From that point on, [wife] was the primary driver of the Mercedes SL until the parties' separation. Joint funds were used to . . . pay for the upkeep and maintenance of the . . . Mercedes." The classification of the Mercedes as marital property solely on this basis was an abuse of discretion by the trial court, and we reverse that decision.

Here, wife made payments for upkeep and maintenance of the Mercedes, thereby contributing marital property to husband's separate property. Wife's payments therefore transmuted to separate property, the category of property receiving the contribution, and the burden then falls upon wife to retrace her payments. Under this statute, wife's payments for the upkeep of the Mercedes make the Mercedes hybrid property at best. However, the prenuptial agreement, in which each party "relinquishe[d] any and all claims and rights that he or she may have had, may now have, or may hereafter acquire against the property of the other by virtue of their marriage or pursuant to Section 20-107.3 of the Code of Virginia[,]" provides that the Mercedes, listed in the prenuptial agreement as husband's separate property acquired prior to the marriage, remain separate property in any event, regardless of wife's financial contributions towards the vehicle's upkeep. Thus, the Mercedes remains husband's separate property, and the trial court erred in classifying the Mercedes as marital property. Accordingly, we reverse the trial court's classification of the Mercedes.[5]

### 2. The Lexus

Husband next argues that the Lexus is titled in his name and, thus, remains his separate property under the agreement.

---

[5] Husband also argues that the Mercedes was not a gift to wife. However, neither the commissioner nor the trial court made any finding that husband had gifted the Mercedes to wife. Thus, we do not address this issue on appeal.

"The owner of an automobile is the party who has legal title to it." McDuffie v. Commonwealth, 49 Va. App. 170, 175, 638 S.E.2d 139, 141 (2006); see also Code § 46.2-100. "A certificate of title serves not only as a substitute recording system but also as evidence of ownership." McDuffie, 49 Va. App. at 175-76, 638 S.E.2d at 141; see also Travelers Indem. Co. v. Nationwide Mut. Ins. Co., 227 F. Supp. 958, 963 (W.D. Va. 1964); Bolden v. Commonwealth, 28 Va. App. 488, 492-93, 507 S.E.2d 84, 86 (1998).

Husband had sole legal title to the Lexus. Husband is thus the vehicle's owner, and as a result, the Lexus is his separate property. Pursuant to the prenuptial agreement, wife forfeited any interest she may have had in the Lexus by virtue of her financial contributions towards the vehicle. The Lexus remains husband's separate property, and the trial court abused its discretion in classifying it as marital property. Thus, we reverse the judgment of the trial court in this regard as well.

### C.  The Buffalo and Farm Equipment

Husband's final contention on appeal is that the trial court erred in classifying the buffalo and assorted farm equipment as marital, because the prenuptial agreement prohibited the creation of marital property. We affirm the trial court's classification of the buffalo and farm equipment as marital property.

"Property acquired during the marriage is presumptively marital, unless shown to be separate property." Robinson v. Robinson, 46 Va. App. 652, 662, 621 S.E.2d 147, 152 (2005); Code § 20-107.3(A)(2)(iii). Husband concedes that the parties used their joint checking account to purchase all of these items during the marriage. However, as noted above, husband argues that the parties' joint First Virginia checking account was only for convenience and that the parties intended to keep their money separate. Thus, husband reasons that the joint checking account was his "de facto" separate account. Accordingly, husband concludes that the buffalo

- 7 -

and farm equipment were all purchased from separate funds and, therefore, remain his separate property under the relinquishment of claims section of the prenuptial agreement.[6] However, the only evidence husband presented that the First Virginia account was, in fact, intended to be his separate property was his own testimony. As stated above, wife disputed the testimony, and the chancellor implicitly rejected husband's testimony. In fact, wife testified that she deposited a portion of her paycheck into the First Virginia account, and offered into evidence several checks from husband's parents made to her as gifts of their estate that were deposited into the account.

Viewing the evidence in the light most favorable to wife, we reject husband's assertion that the First Virginia account was comprised solely of husband's separate property. Because husband and wife purchased the farm equipment and buffalo with marital property, and because husband did not meet his burden of retracing his separate funds from these purchases, see Code § 20-107.3(A)(3)(d), we affirm the trial court's classification of this property as marital.

## D. Attorney's Fees

Wife argues on cross-appeal that the trial court erred in holding that the prenuptial agreement barred her from an award of attorney's fees from husband. We disagree.

"Antenuptial agreements, like marital property settlements, are contracts subject to the rules of construction applicable to contracts generally, including the application of the plain meaning of unambiguous contractual terms." Pysell v. Keck, 263 Va. 457, 460, 559 S.E.2d 677, 678 (2002). "'Where an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself[.]'" Va. Elec. & Power Co. v. N. Va. Reg'l Park Auth., 270 Va. 309, 316, 618 S.E.2d 323, 326

---

[6] As stated above, this section provides that the parties "release[] and relinquish[] any and all claims and rights that he or she may have had, may now have, or may hereafter acquire against the property of the other by virtue of their marriage or pursuant to Section 20-107.3 of the Code of Virginia."

(2005) (quoting <u>Berry v. Klinger</u>, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983)).  Furthermore, "[c]ontracts are not rendered ambiguous merely because the parties disagree as to the meaning of the language employed by them in expressing their agreement."  <u>Wilson v. Holyfield</u>, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984).  Whether the terms of a contract are ambiguous is a question of law that we review *de novo*.  <u>See</u> <u>id.</u>

The prenuptial agreement plainly states that, "[i]n the event of the dissolution of marriage, the parties hereto agree to be responsible for their own respective attorney's fees and costs and to waive and release any claim against the other for legal fees and costs."  Wife nevertheless argues that "the contract as a whole contemplated that only fees to dissolve the marriage would be barred" and that the provision itself "does not expressly bar or waive attorney's fees to enforce other rights created under the agreement."  In other words, wife argues that the prenuptial agreement prevents her from seeking attorney's fees only in litigating the dissolution of the marriage itself and, thus, does not prevent her from seeking fees stemming from the equitable distribution *accompanying* the divorce.  We reject wife's argument, finding no ambiguity in the clear and plain language of the prenuptial agreement, which prevents "any claim against the other for legal fees and costs."  We agree with the trial court that the prenuptial agreement "is clear and unambiguous in that neither party is responsible for the fees of the other."  Therefore, we hold that wife is not entitled to collect attorney's fees from husband, and affirm the trial court.

CONCLUSION

For the reasons stated therein, we affirm the trial court's classification of the Legg Mason account, buffalo, and farm equipment as marital property, and reverse the trial court's classification of the Mercedes and Lexus as marital property.  We also affirm the trial court's holding that

husband and wife's prenuptial agreement prohibits wife from collecting attorney's fees from husband. We remand the case for further proceedings consistent with this opinion.

<u>Affirmed in part, reversed in part, and remanded.</u>

Haley, J., concurring, in part, and dissenting, in part.

I respectfully dissent only as to the majority's conclusion regarding the Legg Mason account.

The parties entered into a prenuptial agreement on September 4, 1992. Attached to that agreement was a schedule of their respective separate property. Husband's separate property included stock in White City Electric Company (White City Electric) and an account at Fidelity Investments (Fidelity). The majority concludes that husband failed to trace this separate property into Legg Mason. I disagree.

The Legg Mason account at issue was funded in February 1999, by transfer from husband and wife's joint investment account with Cornerstone Capital Management (Cornerstone). The source of funds in the Cornerstone account, therefore, is critical to our evaluation of this cause. In 1997, husband received a distribution in the amount of $273,146 for his ownership of White City Electric stock, listed as husband's separate property in the prenuptial agreement. Husband deposited the White City Electric distribution in a joint checking account at First Virginia Bank.[7] In addition to his salary and other income, the First Virginia Bank also included money received from husband's Fidelity account (listed as his separate property in the prenuptial agreement) and money given by husband's parents to both parties as tax-free gifts from their estate.[8]

On September 7, 1997, husband and wife met with Gregory McCauley (McCauley) of Cornerstone to open a joint account, for the purpose of funding their retirement 10 to 15 years later.

_____

[7] Throughout his testimony, husband insists that the parties maintained separate finances and that the accounts at both First Virginia and Cornerstone were *his* accounts, set up as joint accounts purely for convenience. In addition to the joint checking account at First Virginia, wife maintained a separate account at Blue Ridge Bank.

[8] Both husband and his father argue that the gifts were intended to be for husband. Nevertheless, husband's parents wrote several checks to wife for the purpose of passing their estate tax-free to the parties. On direct examination, husband explained that a portion of those gifts to wife, totaling "roughly $20,000," was deposited into an investment account at Fidelity.

To finance the Cornerstone account, husband and wife wrote three checks. First, on September 26, 1997, wife wrote a check to Cornerstone in the amount of $20,000, drawn on the parties' joint checking account at First Virginia.[9] On December 15, 1997, wife wrote a second check from that account in the amount of $77,500. Shortly thereafter, husband wrote a check to Cornerstone from the same First Virginia account in the amount of $155,000.

Husband argues that the trial court erred in classifying the parties' joint Legg Mason account as marital property. Because the Legg Mason account was financed with both separate and marital assets, the statutory guidelines for classification of commingled property necessarily apply. Code § 20-107.3(A) provides, in pertinent part:

> (3) The court shall classify property as part marital property and part separate property as follows:
>
> *       *       *       *       *       *       *
>
> (d) When marital property and separate property are commingled by contributing one category of property to another, resulting in the loss of identity of the contributed property, the classification of the contributed property shall be transmuted to the category of property receiving the contribution. However, to the extent the contributed property is retraceable by a preponderance of the evidence and was not a gift, such contributed property shall retain its original classification.
>
> (e) When marital property and separate property are commingled into newly acquired property resulting in the loss of identity of the contributing properties, the commingled property shall be deemed transmuted to marital property. However, to the extent the contributed property is retraceable by a preponderance of the evidence and was not a gift, the contributed property shall retain its original classification.

---

[9] Wife offered evidence, in the form of a check register, to show that the parties deposited $20,038.73 into their First Virginia account to cover the first check written to Cornerstone on September 26, 1997. The checks deposited include: 1) $9,500 to husband from his mother; 2) $9,500 to wife from husband's parents; 3) $73 to husband and wife from the Commonwealth of Virginia Department of Taxation; and, 4) $964.73 to husband from his parents.

In the cause at hand, husband may retain his separate property if he can show the property "is retraceable by a preponderance of the evidence and was not a gift." Code § 20-107.3(A)(3)(h) states, "No presumption of gift shall arise under this section where (i) separate property is commingled with jointly owned property; (ii) newly acquired property is conveyed into joint ownership; or (iii) existing property is conveyed or retitled into joint ownership."

In Rahbaran v. Rahbaran, 26 Va. App. 195, 208, 494 S.E.2d 135, 141 (1997), this Court held:

> In order to trace the separate portion of hybrid property, a party must prove that the claimed separate portion is identifiably derived from a separate asset. This process involves two steps: a party must (1) establish the identity of a portion of hybrid property and (2) directly trace that portion to a separate asset.

"When a party satisfies this test, and by a preponderance of the evidence traces his or her separate contributions to commingled property, the code states that the contributed separate property '*shall* retain its original classification.'" Hart v. Hart, 27 Va. App. 46, 68, 497 S.E.2d 496, 506 (1998). Husband can prevail, therefore, by sufficiently tracing the source of the Legg Mason funds to his separate property.

The Legg Mason account was initiated by a transfer of funds from the parties' joint account at Cornerstone. Therefore, we must look to the source of the Cornerstone funds to determine whether husband's separate property financed the Legg Mason account.

Husband submitted into evidence an IRS form 1099-MISC from tax year 1997, showing his receipt of $273,146 from White City Electric. Husband testified that the money he received from White City Electric was deposited into the parties' joint account at First Virginia and it was used to finance the Cornerstone account. Wife corroborated that testimony. On direct examination, when asked how the couple arrived at the $155,000 figure for the final deposit to Cornerstone, wife stated that husband:

had monies that was [sic] put into the account from his father, which were large sums – White City Electric was part of it, or his father had given him some monies. And this was given to him, and he put it into our account . . . . And it was based upon our retirement, and the 155 was the amount that was agreed upon to go into it because I think that's what was rolled over from the prior account.

Husband also testified that proceeds from his Fidelity account were contributed to the Cornerstone account. Wife corroborated that testimony, as well. When asked how the parties decided to contribute $77,500 in the second deposit to Cornerstone, wife explained, "[W]e just had made a larger deposit into our joint account, and this was from – actually investments that he had – a [F]idelity investment in Zurich, I believe. And they totaled about $80,000 . . . ." In the parties' prenuptial agreement, the Fidelity account was listed as husband's separate property. However, on direct examination, husband testified that, since the parties were married, "roughly $20,000" of wife's money (gifts received from husband's parents) had been deposited into the Fidelity account.

Regarding the parties' initial deposit to Cornerstone, wife submitted into evidence a check register showing that, on the same day that wife wrote a $20,000 check to Cornerstone, a deposit was made to the parties' joint account at First Virginia in the amount of $20,038.73, ostensibly to cover the check to Cornerstone. That deposit included a check from husband's parents to wife for $9,500. The rest of the deposit included $73 to husband and wife from the Commonwealth of Virginia, and two checks to husband from his parents totaling $10,464.73.

The evidence overwhelmingly suggests, therefore, that the Cornerstone account included part marital, part separate, and part hybrid property. Both parties agree that husband's White City Electric money, and proceeds from the Fidelity account, contributed to their joint account at Cornerstone. In the cause at hand, the total equity contributed to the Cornerstone account by the

parties equaled $252,500.[10] Of this amount, however, husband withdrew $55,000 to purchase an annuity in his name. Therefore, the total contributed equity that was later transferred to the Legg Mason account equaled the difference, $197,500. At least a portion of that balance necessarily came from husband's separate property.

After the Cornerstone funds were transferred to the Legg Mason account, three deposits were made to the Legg Mason account, totaling $26,008.33. Of this amount, wife's separate property represented $2,500, or the undisputed amount that she contributed to the purchase of Microsoft and Yahoo stock. Husband's separate property necessarily equaled $2,057.33. The remaining amount deposited to Legg Mason, $21,451, was marital property in the form of tax refund checks received by the parties for tax year 2001. These additions bring the value of the total contributed equity to $223,508.33 and further support the conclusion that the Legg Mason account included part wife's separate property, part husband's separate property, and part marital property.

It should be noted that the above analysis of the composition of the Legg Mason account, with respect to White City Electric and Fidelity, is based upon undisputed funds and documentary evidence. I would hold that husband traced those contributions of separate property into Legg Mason, that Legg Mason was part wife's separate property, part husband's separate property, and part marital property, and thus remand to the trial court to apportion the same. That conclusion is strengthened by the incongruous findings by the trial court: the determination, unappealed, that the annuity purchased with funds from Cornerstone was husband's separate property, and the determination that Legg Mason, created by the transfer of all of Cornerstone's assets, was wholly marital. The source of funds for both was the same.

---

[10] This number represents the sum of the three deposits made to Cornerstone: $20,000, $77,500, and $155,000.